TOWN OF LAFAYETTE, Appellant, v. CITY OF CHIPPEWA FALLS, Respondent. [Case No. 113.]
TOWN OF HALLIE, Appellant, v. CITY OF CHIPPEWA FALLS, Respondent. [Case No. 114.]

*Nos. 113, 114 (1974). Argued October 27, 1975.—
Decided November 25, 1975.*
(Also reported in 235 N. W. 2d 435.)

---

[3] *State v. Hartman* (1972), 54 Wis. 2d 47, 194 N. W. 2d 653.

612

614

For the appellants there were joint briefs by *Falkenberg & Sazama* of Cadott for the town of Lafayette and *Thornton & Black* of Eau Claire for the town of Hallie, and oral argument by *Russell R. Falkenberg* and *John Thornton.*

For the respondent there was a brief and oral argument by *B. James Colbert,* Chippewa Falls city attorney.

BEILFUSS, J. The plaintiff-towns contend that the annexation ordinance is invalid for two reasons: (1) The majority of the qualified electors residing in the annexed area did not sign the petition as required for direct annexation by sec. 66.021 (2) (a), Stats.; and (2) the annexation was contrary to the rule of reason.

The plaintiffs argue that the trial court erred in concluding that a majority of the electors residing at Northern Colony and Training School had signed the petition for direct annexation as required by sec. 66.021 (2) (a), Stats.[2] The general qualifications for electors are set forth in sec. 6.02.[3] Under sec. 6.03, Stats. 1971,[4]

[2] "66.021 Annexation of territory. . . . (2) METHODS OF ANNEXATION. Territory contiguous to any city or village may be annexed thereto in the following ways:

"(a) *Direct annexation.* A petition for direct annexation may be filed with the city or village clerk signed by:

"1. A majority of the electors residing in such territory and either a. the owners of one-half of the land in area within such territory, or b. the owners of one-half of the real property in assessed value within such territory; or

"2. If no electors reside in such territory, by a. the owners of one-half of the land in area within such territory, or b. the owners of one-half of the real property in assessed value within such territory."

[3] "6.02 **Qualifications, general.** (1) Every United States citizen age 18 or older who has resided in this state for 6 months preceding any election and who has resided in an election district or ward for 10 days before any election where he offers to vote is an eligible elector.

"(2) Any United States citizen age 18 or older who has resided in this state for 6 months preceding any election, but who has not resided in the election district or ward for 10 days preceding any election is entitled to vote in the election in the election district or ward within this state where he was last a qualified elector.

"(3) Any United States citizen age 18 or older who has resided in this state for 6 months preceding any election, but who moves within this state after registration closes shall vote at his old ward if otherwise qualified, or he may vote in the new

persons who are "under guardianship, *non compos mentis, or insane*" are disqualified from voting. None of the patient-residents at Northern Colony signed the petition for direct annexation.

Twenty-four individuals who were patient-residents of Northern Colony at the time the petition was circulated testified at the trial. Their testimony indicated, and the trial court found, that all met the age and residence requirements for an elector and that none were under a court-appointed guardianship at that time. The plaintiffs dispute the trial court's finding of fact that none of those who testified at the trial and none of the other residents who met the age and residence requirements at the time the petition was circulated "were capable of managing themselves or their affairs by virtue of their mental deficiency, and all were *non compos mentis* and under the guardianship of the State of Wisconsin."

An annexation ordinance is presumed valid and the party attacking or challenging it bears the burden of proving it invalid.[5] The trial court's finding of fact that the patient-residents of Northern Colony were under guardianshp and *non compos mentis,* and therefore disqualified as electors, cannot be overturned unless it is

---

ward if he can comply with the 10-day residence requirement at the new address and complies with s. 6.55."

[4] "6.03 **Disqualification of electors.** (1) The following persons shall not be allowed to vote in any election and any attempt to vote shall be rejected.

"(a) Any person under guardianship, non compos mentis, or insane;

"(b) Any person convicted of treason, felony or bribery, unless his civil rights are restored.

"(2) No person shall be allowed to vote in any election in which he has made or become interested, directly or indirectly, in any bet or wager depending upon the result of the election." *See also:* Wis. Const., art. III, sec. 2.

[5] *Town of Menasha v. City of Menasha* (1969), 42 Wis. 2d 719, 168 N. W. 2d 161; *Mt. Pleasant v. Racine* (1965), 28 Wis. 2d 519, 137 N. W. 2d 656.

contrary to the great weight and clear preponderance of the evidence.[6]

The term "guardianship" is not defined in ch. 6, Stats. Plaintiffs contend that the definition of the term in sec. 880.01 (3) should control. That section provides:

"880.01 **Definitions.** . . .

"(3) 'Guardian' means one appointed by a court to have care, custody and control of the person of a minor or an incompetent or the management of the estate of a minor, an incompetent or a spendthrift."

Plaintiffs point out that none of the patient-residents at Northern Colony who testified at the trial were subject to a court-appointed guardian at the time the petition was circulated. The trial court determined that it was not bound by the definition of sec. 880.01 (3) and held that the residents were under guardianship of the state.

The definitions contained in sec. 880.01, Stats., are prefaced by the provision "[f]or the purpose of this chapter." This court has held that where a statutory definition is explicitly stated to apply "in this chapter," it is not mandatory that a court accept the definition in its interpretation of a statute not within the chapter. *Paulsen Lumber, Inc. v. Meyer* (1970), 47 Wis. 2d 621, 177 N. W. 2d 884.

Where words used in a statute are not specifically defined they should be accorded their ordinary and accepted meaning.[7] This meaning may be established by the definition contained in a recognized dictionary.[8]

[6] *Town of Waukechon v. Shawano* (1972), 53 Wis. 2d 593, 193 N. W. 2d 661; *City of Beloit v. Town of Beloit* (1970), 47 Wis. 2d 377, 177 N. W. 2d 361; *Town of Menasha v. City of Menasha, supra.*

[7] *See: State (Board of Regents) v. Madison* (1972), 55 Wis. 2d 427, 198 N. W. 2d 615; *Snorek v. Boyle* (1962), 18 Wis. 2d 202, 118 N. W. 2d 132.

[8] *Edelman v. State* (1974), 62 Wis. 2d 613, 215 N. W. 2d 386; *Estate of Nottingham* (1970), 46 Wis. 2d 580, 175 N. W. 2d 640.

Black's, *Law Dictionary* (4th ed. 1951), defines "Guardian" at page 834:

"A guardian is a person lawfully invested with the power, and charged with the duty, of taking care of the person and managing the property and rights of another person, who, for some peculiarity of *status*, or defect of age, understanding, or self-control, is considered incapable of administering his own affairs."[9]

The Mental Health Act (ch. 51, Stats.), governs the admission of persons to Northern Colony and Training School. Sec. 51.002 (1) provides:

"**Care and custody of committed persons.** (1) Any person committed under this chapter shall be committed under the care and custody of a board established under s. 51.42 or 51.437, or the department if the department finds such person to be a nonresident of this state."

We agree with the trial court that the state, through the appropriate board, is the guardian of those persons under the commonly accepted and ordinary meaning of that term.

Persons who are *non compos mentis* or insane are, by the terms of sec. 6.03 (1), Stats. 1971, and art. III, sec. 2 of the Wisconsin Constitution, disqualified from voting. Neither term is defined in ch. 6, and no case has been found which has construed the cited provisions in this context. This restriction upon the franchise right is apparently not uncommon, but it is generally unclear what the terms mean. *See:* 25 Am. Jur. 2d, *Elections,* p. 777, sec. 89. One author has observed:

". . . The lack of a definition in most state statutes makes it difficult to determine whether the prohibition is applicable only to persons hospitalized in mental institutions, whether it extends only to those legally adjudged incompetent, whether both classes are encompassed, or whether the law is even broader and applies to any men-

---

[9] *See also:* 39 Am. Jur. 2d, *Guardian and Ward,* p. 21, sec. 19.

tally ill person, hospitalized or at large, adjudged incompetent or not." Brackel & Rock, *The Mentally Disabled and the Law* (Rev. ed. 1971), ch. 9, p. 308.

Webster's, *New International Dictionary* (3d ed.), defines the terms as follows:

"*non compos mentis*—[L, lit., not having mastery of one's mind]: not of sound mind: wholly lacking mental capacity to understand the nature, consequences, and effect of a situation or transaction." p. 1536

"insane—1 a *obs, of the mind:* UNSOUND, DISORDERED b *of a person:* exhibiting unsoundness or disorder of mind: affected with insanity: MAD; *esp:* disordered in mind to such a degree as to be unable to function safely and competently in ordinary human relations—compare PSYCHOTIC." p. 1167

The phrase *"non compos mentis,"* as used in the electors' statute and the constitution, should be construed as a generic term that includes mental deficiency as well as insanity. There are, of course, degrees of mental deficiency and insanity or, as our statute describes it, mental illness. We believe the constitution and the statute intend that persons who are mentally incapable of knowing or understanding the nature and objective of the elective question should not be eligible to vote.

We are not concerned in this case with insanity or mental illness but rather with those persons suffering from mental deficiency.

The purpose of Northern Colony and similar institutions is set forth in sec. 51.22 (1), Stats.:

"PURPOSE. The purpose of the northern colony and training school, of the central colony and training school and of the southern colony and training school is to care for, train and have the custody of mentally deficient persons."

"Mental deficiency" is defined in sec. 51.75, Stats., under Art. II (g) of the Interstate Compact on Mental Health:

"(g) 'Mental deficiency' means mental deficiency as defined by appropriate clinical authorities to such extent that a person so afflicted is incapable of managing himself and his affairs, but shall not include mental illness as defined herein."

"Mental illness" is defined under Art. II (f) as:

"(f) 'Mental illness' means mental disease to such extent that a person so afflicted requires care and treatment for his own welfare, or the welfare of others, or of the community."

The General Comment of Interim Committee, 1947, states that ". . . the term mentally ill is used instead of insane, mentally infirm instead of senile, mentally deficient instead of feeble-minded, idiotic, or imbecilic . . . ."[10]

Commitment or admission to Northern Colony is either involuntary under the provisions of secs. 51.01, 51.02 and 51.065, Stats., or voluntary under sec. 51.10 (1) and (1a). Sec. 51.005 (2) provides:

"LEGAL EFFECT OF HOSPITALIZATION. Hospitalization under this chapter, whether by voluntary admission or commitment, is not an adjudication of legal incompetency, but merely raises a rebuttable or disputable presumption of incompetency while the patient is under the jurisdiction of hospital authorities."

Plaintiffs contend that this presumption of incompetency was effectively rebutted by the evidence. A number of the patients who testified at the trial indicated that they had either attended a voters' school or actually voted in the election. Claudia Maves, a psychologist employed by the state at Northern Colony, stated that in her opinion all of the persons who had testified had the

[10] *See:* 7 W. S. A., p. 180.

intellectual capacity to understand voting with the proper instruction. In holding that the evidence was insufficient to rebut the statutory presumption of incompetency, the court stated:

"No evidence was forthcoming that any one of them was not mentally deficient. There was some testimony that some of the individuals had attended or were attending voting school at the Colony and that some had sufficient capacity to manipulate a voting machine and even to understand issues. The court observed those persons who were committed to the Colony and testified. In all instances excepting two it was obvious to the court from observing the witness and listening to his testimony that he was mentally deficient. All but two of those who testified had no knowledge or understanding of why they were in court. The fact remains that they were all mentally deficient and under the care and custody of the state at the time the petition was filed. The court understands and appreciates the care and training given these individuals committed to the Colony and the hope and desire by the personnel who work with them to see them become trained sufficiently to ultimately become discharged permanently and take a place, even though limited, in society. Nonetheless, I must conclude that although there are degrees of mental deficiency this court cannot make sufficient distinction on the record made to determine which ones if any were capable intelligence-wise to be an elector if such a determination were to be considered germane (the court does not) to the issues here."

Our review of the trial transcript indicates that this is an accurate analysis of the testimony. In any case, the findings of fact and conclusions of law that follow are not contrary to the great weight and clear preponderance of the evidence.

Throughout the trial the court expressed concern over the possibility that the privilege of the residents to maintain the confidential nature of their private medical files would be jeopardized by plaintiffs' attempt to show competence. The privilege of a patient to prevent the

disclosure of confidential communications made or information obtained or disseminated for purposes of diagnosis or treatment of his mental condition is outlined in sec. 905.04, Stats., of the Evidence Code. The record reveals that only two of the residents specifically waived that privilege. The difficulty of plaintiffs' proof of competency in the absence of the records is apparent.

At one point in the questioning of Claudia Maves, the court advised her that she could invoke the privilege on behalf of the patients. Plaintiffs were allowed to solicit Mrs. Maves' opinion as to the general mental capacity of residents at Northern Colony. However, she refused to give an opinion as to the competency of individual residents after the court suggested that such an opinion would open the records of the individuals on cross-examination. Plaintiffs allege that they were deprived by the court of an opportunity to establish individual competence. However, they cite no authority for this position and we believe it to be without merit.

We agree with the trial court that patient-residents of Northern Colony at the time in question were wards of the state and under guardianship to the state; we also agree that the plaintiff-towns have not overcome the rebuttable presumption of incompetency and that the patient-residents of Northern Colony were not eligible electors.

The majority of electors and landowners did sign the petition for direct annexation as required by statute.

The plaintiff-towns contend this annexation does not comply with the "rule of reason."

This court is committed to the rule of reason in determining the validity of annexations.[11] Under the rule of

[11] *See: In re City of Beloit* (1968), 37 Wis. 2d 637, 155 N. W. 2d 633; *Town of Brookfield v. City of Brookfield* (1957), 274 Wis. 638, 80 N. W. 2d 800; *Town of Fond du Lac v. City of Fond du Lac* (1964), 22 Wis. 2d 533, 126 N. W. 2d 201.

reason: (1) Exclusions and irregularities in boundary lines must not be the result of arbitrariness; (2) some reasonable present or demonstrable future need for the annexed property must be shown; and (3) no other factors must exist which would constitute an abuse of discretion.[12] Failure to satisfy any one of these requirements renders the annexation arbitrary and capricious and invalid. In applying this rule the trial court findings will not be set aside unless they are "contrary to the great weight and clear preponderance of the evidence."[13]

The annexation ordinance created two islands within the new boundaries of the city of Chippewa Falls, one in the town of Hallie and the other in the town of Lafayette. The towns do not contend on appeal that these islands resulted from arbitrary or capricious action by the city. In *Town of Waukesha v. City of Waukesha, supra,* at page 532, this court stated:

"Where landowners petition for annexation, they are under no obligation to go beyond their immediate area of ownership to include persons or areas of no concern to them."

In this case, the state as landowner was under no obligation to consult the residents of the towns over whom it had no control and as to whose actions it was not concerned.

The plaintiff-towns' primary contention on appeal is that the evidence does not establish any need on the part of the city of Chippewa Falls for the Northern Colony land. This court has stated that unless a municipality shows some reasonable present or demonstrable future

[12] *Town of Lyons v. Lake Geneva* (1972), 56 Wis. 2d 331, 337, 202 N. W. 2d 228; *Town of Waukesha v. City of Waukesha* (1973), 58 Wis. 2d 525, 206 N. W. 2d 585.

[13] *Town of Waukechon v. Shawano, supra; City of Beloit v. Town of Beloit* (1970), 47 Wis. 2d 377, 177 N. W. 2d 361; *Town of Menasha v. City of Menasha, supra.*

need, the annexation proceeding violates the rule of reason. *Elmwood Park v. Racine* (1966), 29 Wis. 2d 400, 412, 413, 139 N. W. 2d 66; *Town of Waukechon v. Shawano, supra.* In the *Town of Waukechon Case,* the court indicated that a showing of any reasonable need will satisfy this requirement and the annexation will be upheld without regard for what this court might think is in the best interest of the parties.[14]

In the *Elmwood Park Case,* this court approved the consideration of a number of factors to determine whether the need requirement had been met: (1) A substantial increase in population; (2) a need for additional area for construction of homes, mercantile, manufacturing or industrial establishments; (3) a need for additional land area to accommodate the present or reasonably anticipated future growth of the municipality; and (4) the extension of police, fire, sanitary protection or other municipal services to substantial numbers of residents of adjacent areas. In another case, the need requirement was held to have been met where the city proceeded to annexation in an attempt to eliminate a possible pollution problem and to expand residential areas in the vicinity of schools. *Town of Waukechon v. Shawano, supra.*

In this case city officials testified, and the trial court found, that the annexed state lands were not needed for and, indeed, could not be adapted to city commercial, business or residential uses as long as the area remained under the control of the state. Mayor Halbleib testified that the city's population had increased by 643 between 1960 and 1970, and that there was considerable undeveloped city land adjacent to the annexed area which could be used for expansion. There was also testimony that the city had been providing the colony with water and sewer service under contract since 1967. The city

---

[14] *See also: City of Beloit v. Town of Beloit, supra,* at page 385.

argued that annexation was desirable under these circumstances to avoid setting a precedent of providing nonresidents with city services. The city engineer stated that while the state paid a service charge for sewer service, this amount only covered the expense of operating the waste treatment plant and that the city was required to absorb maintenance expenses. Halbleib stated that the city's primary need for the annexed area was the increased certainty it afforded the city in its long-range planning and in establishing spending priorities. Halbleib expressly admitted, however, that the Northern Colony land could not be developed by the city in any way and that adjacent city land could be developed without annexation to the colony.

The plaintiffs point out, and city officials admitted, that the city stood to gain a considerable tax advantage as a result of annexation. Halbleib testified that he was, at all times, aware of the potential for increased shared tax benefits which would accrue to the city under secs. 79.01 and 79.02, Stats. (effective date November 5, 1971) as a result of annexation. Walter Boos, the administrative assistant comptroller for the city, testified that the city would gain between $34,000 and $36,000 with the addition of Northern Colony. Boos also stated that there would be some advantage from the federal tax sharing program, but that the amount was uncertain. The towns stood to lose these amounts as a result of annexation. City officials also testified, however, that the financial gain would help offset the cost of providing services to the colony.

This review of the evidence demonstrates that the only traditional factor deemed relevant to a finding of need of the city which is present in this case is the prior extension by the city of water and sewer services to the colony. Mayor Halbleib's contention that annexation would foster better long-range planning and more economical spending carries little weight in light of the fact

that the city could exercise little or no control over what occurred at the colony. The Northern Colony land certainly does not meet the traditional requirements of suitability for and adaptability to city purposes.[15]

The predominate need in this case was on the part of the state. In the meetings and correspondence leading to annexation, Mayor Halbleib emphasized the services which the city could provide to Northern Colony, many of which could not be provided by the towns. Most of the services were available to the colony prior to annexation, although there was a charge for some of them. These services included the use of library and recreational facilities and the provision of fire and police protection. Francis Powers, administrator of the division of business management for the department of health & social services, testified that the state decided to petition for annexation primarily because of the colony's need for increased and more certain fire protection and more competitive bids for the solid waste disposal. Factors of lesser importance included the potential use of city recreational facilities and better quality emergency police and rescue service. Arthur Nelson, superintendent of Northern Colony and Training School, stated that annexation might afford more opportunities for contracting out for work which would otherwise have to be performed by state personnel.

The plaintiffs contend that there has been no showing of need on the part of Chippewa Falls but only of various advantages, the chief among which being the added tax revenue. They also point out that under the rule of *City of Beloit v. Town of Beloit, supra,* at page 391, the fact "that a particular city will be best able to provide services for an area does not satisfy the rule of reason."

This action involves the annexation of state-owned and state-controlled property which, by its nature, is

---

[15] *See: Town of Brookfield v. City of Brookfield, supra;* and *In re City of Beloit, supra.*

neither very adaptable to nor suitable for city needs and uses. The state, however, is specifically authorized to petition for annexation by the provisions of sec. 24.40 (2), Stats. This statute would be rendered meaningless if the petition had to be rejected or an annexation ordinance declared invalid on the grounds that the city could establish no commercial, residential or mercantile need for the land.

The annexation ordinance was passed in response to a petition by the state to the city. One author has suggested that the need element serves a useful purpose in furthering the public policy favoring orderly growth of urban areas by preventing irrational "gobbling up of territory."[16] The factors deemed relevant to establishing need are best suited to avoiding this danger where the annexation proceeding is instituted by the annexing municipality. In *City of Beloit v. Town of Beloit, supra,* at page 391, this court stated:

"Thus, given the procedures in sec. 66.024, Stats., some demonstrable need must be shown or the annexation is of necessity arbitrary and capricious."

Where the annexation ordinance is adopted at the request of the electors and landowners in the subject area, however, this danger may be avoided by assuring that the request was not the result of any undue influence or pressure from the annexing municipality. The relevance and importance of the "will or wish of the petitioners" was emphasized in this court's latest annexation case. *See: Town of Waukesha v. City of Waukesha, supra.*

In cases of direct annexation, absent unfair inducement or pressures[17] upon the petitioners, a showing of benefits to the annexed land can be considered in the overall

[16] *See:* Knowles, *The Rule of Reason in Wisconsin Annexations,* 1972 Wisconsin Law Review 1125, 1137.

[17] *Town of Fond du Lac v. City of Fond du Lac, supra.*

question of need under the rule of reason. The showing of benefits to the state is abundant here. In any case, under the view that any reasonable need will satisfy the rule of reason requirements, the trial court's finding that the need element was met must be affirmed.

The underlying dispute in this case is the towns' loss and the city's consequent gain in tax revenue as the result of annexation. The plaintiff-towns contend that the annexation was arbitrary and capricious because the city's sole purpose in pursuing the matter was to gain the additional revenue. This court has held that an annexation solely for revenue purposes is invalid only where it is objected to in the territory to be annexed. *See: Wilson v. Sheboygan* (1939), 230 Wis. 483, 495, 283 N. W. 312. As here, the *Wilson Case* involved a refund of taxes by the state to the municipality. The court there stated that it was not for the town to deprive the residents of the annexed area of the advantages offered by the city merely because the annexation would deprive the town of the refunded taxes. Other courts have held that increase in revenue is but one of several factors to consider on review, and it is neither determinative nor conclusive. *See:* 2 McQuillin, *Municipal Corporations,* p. 400, sec. 7.23.

The plaintiffs argue the arbitrary nature of the annexation is further evidenced by the city's role in initiating discussions on annexation and in encouraging the state to circulate the petition. Robert Halbleib, the mayor, testified that if he had not made the initial contact with Arthur Nelson there was "a strong possibility that the Northern Colony properties would still be in the outlying townships." He also stated that the city had never refused a petition for annexation in the past. In response to a question as to whether he would characterize Halbleib's efforts on behalf of the city as a "sell job," Francis Powers stated:

"Oh, I think the mayor was very interested in having the Colony come into the city. I guess the use of sell job, described to some extent, the attitude of the city to the problem."

Nevertheless, state officials testified that the city at no time threatened to withdraw services to the colony and in no other way pressured the state into petitioning for annexation. It was the state, not the city, that petitioned for annexation based upon reasons advantageous to it.

What was said in *Town of Waukesha v. City of Waukesha, supra,* at page 530, is relevant here:

"Here there is no gainsaying that the city of Waukesha wanted, encouraged and aided the petitioners in acting as they did. But there is no evidence that would make the city of Waukesha a puppeteer and the petitioners puppets dancing on a municipal string. They acted in the light of their desires and their best interests as they saw them and their right to do so, statutorily provided, is not to be disregarded."

The rule of reason has been satisfied and the annexation is valid.

*By the Court.*—Judgments affirmed.