## SANS VS. JOERRIS.

It is no justification in an action for a libel, that the libellous matter had been previously published by a third person, and that the defendant, at the time of his publication, disclosed the name of that person, and believed all the statements contained in the libel to be true.

APPEAL from the Circuit Court for *Jefferson* County.

Action for maliciously writing and publishing of the defendant, a minister of the Evangelical Lutheran Church, the following libel: "Who and what is *Mr. Sans*?    *    *
He had not been here [at Watertown] long, before bad rumors concerning him or a man bearing his name, originated.

June Term,
1861.

SANS
v.
JOERRIS.

At that time I had the confidence of *Mr. Sans*, and told him about it. He had already heard of it, and told me, among other things, 'There is a worthless wretch bearing my name in America, but I am not he, and I am sorry to be taken for that good-for-nothing fellow.' This statement I partly credited, yet I was induced to write to some persons East. From Cincinnati I received information that the wretch *Sans, alias* Langhoff (it was not said of Watertown), had been guilty of the crimes of arson, church-burning and sodomy. From Boston they wrote me, 'Your *Sans* in Watertown is unknown to me, but I know of one *Sans* who is a contemptible subject; mothers and children have given evidence against him in court; he has been publicly attacked in the newspapers, and has never defended himself, nor been able to defend himself. That *Sans* was one year in one place and another year in another place, &c.' The reader will excuse me for not being able to name the places in which that wretch *Sans* resided, for I gave that letter to a friend, and it has never been returned to me. The information which I received came from persons entitled to credit, and I knew enough then to find out whether he was that contemptible subject, of the existence of which *Sans* of Watertown had personally told me.      *      * I then went to *Mr. Sans* at Watertown, and drew out from him the names of the places in which he had resided, and at what times respectively. To my great surprise, I found that times and places corresponded with those mentioned in the said letter. Add to this, that *Sans* had heard of my receiving letters relating to him, and expressed a desire to be permitted to read them. I had the letters with me, and complied with his urgent wish. He read the letters, and when he had reached the passage in the Boston letter, ' He has not defended himself nor been able to defend,' he said, ' But I did defend myself,' and named a St Louis paper in which he had made his defense. I could hardly suppress my surprise, but remained silent. If these letters had been sufficient evidence before a court of justice, I would at that time already have put an end to his career. But as they were not, I had to keep still. Dear reader, do you not think that the information which I had received did

justify me in avoiding him as a bad man? To-day I am ready June Term 1861.
at any moment to make oath in court to the truth of the
above statement, if the notorious *Sans* would deny them. I SANS v. JOERRIS.
conclude by wishing that *Mr. Sans* may humble himself and
change his heart before God, or seek to make his living in
some other way, and not to heap such shame upon a holy min-
istry." The complaint set forth the libel, with the necessary
inuendoes. The defendant answered, among other things,
that before the writing and publication of the alleged libel-
lous article, he did have several conversations with the plain-
tiff to the effect therein stated; that bad rumors reflecting
upon the character of the plaintiff, or a person of the same
name, were in circulation in said city of Watertown; that
the plaintiff did tell the defendant that there was a good-for-
nothing fellow bearing his name in America, but that he was
not the man; that the defendant did write in relation there-
to to persons in the East, and did receive letters of the char-
acter and import therein stated; that the plaintiff did read
those letters, and did tell the defendant that he had defended
himself, and did name a St. Louis paper in which he made
his defense as stated in said article, and that all the facts
stated in said article are true as therein stated, and that the
defendant did not thereby charge or intend to charge the
plaintiff with having committed sodomy, arson, or any oth-
er crime. The defendant also alleged, for further answer,
that at the time when, &c., he was a minister of the gospel,
&c., that all the statements made by him in the alleged libel-
lous article were true; that from the reports and letters, and
the conversation had concerning them with the plaintiff, the
defendant had good reason to believe, and did believe, that
the plaintiff was an impostor, and was bringing reproach up-
on the gospel ministry; that he made the publication with-
out malice against the plaintiff, believing the matters stated
therein to be true; that the plaintiff had, at various places
named, passed under the assumed name of "Langhoff," and
had been publicly attacked in various newspapers (the names
of which were mentioned in the answer); that at the time of
making said publication, the defendant's general character was
bad; and that the defendant would prove these facts in mitiga-

tion of damages. On the trial, proof was introduced by the defendant for the purpose of showing that the statements in the alleged libel, as to the currency in Watertown of bad rumors about the plaintiff, the receiving by the defendant of the letters containing charges against a person of the name of *Sans*, and the conversation of the plaintiff with the defendant concerning the same, as stated in the alleged libel, were true ; and also for the purpose of proving that the plaintiff was the person who, at several of the places named in that article, had passed by the name of " Langhoff," and that various public attacks had been made upon him. for bad practices, in the several newspapers mentioned in the answer. The instructions given by the court to the jury are sufficiently stated in the opinion of this court. The jury found a verdict for the defendant. A motion for a new trial, on the ground that the court erred in the giving and in the refusing of instructions, was overruled, and exceptions taken.

*Enos & Hall*, for appellants.

*Williams & Leonard*, for respondent :

The publication in this case contains no express charges which are clearly defamatory, but gives a particular statement of facts, and, constructively, the conclusion of the defendant from those facts, that the plaintiff is a bad man and should either reform or abandon his calling. The publication is not libellous on its face. If the facts are true and the conclusion is fairly deducible therefrom, it is not libellous. Whether these were so, were questions of fact for the jury to determine. These questions were left to the jury in this case, and their verdict is conclusive. 4 Wis., 236 ; Starkie on Slander, p. 538, n. 1 ; Introduction to same by Wend., 44–5.

December 30.

*By the Court,* DIXON, C. J. The judgment in this case must be reversed and a new trial granted. The plaintiff's counsel requested the court to instruct the jury that the proof on the part of the defendant was admitted, not to justify or prove the truth of the alleged libel, but in mitigation of damages ; which was refused. The court likewise instructed the jury that if they found that the defendant had the conversation with the plaintiff set out in the libel, and published the libel

without malice in fact, they must find him not guilty. The law is well settled that it is no justification in an action for libel, that the libellous matter was previously published by a third person, and that the defendant, at the time of his publication, disclosed the name of that person and believed all the statements contained in the libel to be true. *Tidman vs. Ainslie*, 28 English Law & Equity Reports, 567, is full to this point. See also *De Crespigny vs. Wellesley*, 5 Bing., 392 (15 E. C. L., 474); *Delegal vs. Highley*, 3 Bing., N. C., 950 (32 E. C. L., 398); *Clarkson vs. McCarty*, 5 Blackf., 574; *Dole vs. Lyon*, 10 Johns., 447; *Johnson vs. Stebbins*, 5 Port. (Ind.), 364; and *State vs. Burnham*, 9 N. H., 34. The doctrine extrajudicially announced in the fourth resolution of the *Earl of Northampton's Case*, 12 Co., 134, that the repetition of slander, if the name of the inventor be given at the time, is not actionable, has never been extended to libel; and even in regard to oral slander has met with disapprobation and may be considered virtually overruled. *Bennett vs. Bennett*, C. & P., 588 (25 E. C. L., 552); *Lewis vs. Walter*, 4 Barn. & Ald., 605 (6 E. C. L., 535); *Crane vs. Douglas*, 2 Blackf., 195; *McPherson vs. Daniels*, 10 B. & C., 263 (21 E. C. L., 69). Whether this doctrine be placed on the ground that the person who needlessly publishes or repeats a previously invented slander, gives to it the credit which is due to himself, or, as was said by Chief Justice BEST in *De Crespigny vs. Wellesley*, that it is every man's moral duty, if he hear anything injurious to the character of his neighbor, which he does not know to be true and which does not concern the public or the administration of justice, to lock it up forever in his own breast; or on the general rule in this world, said to be applicable to nations as well as individuals, that every person should attend to his own affairs, it is, in my judgment, equally sound law, which the security of reputation, the happiness of families and the peace and good order of society demand shall be rigidly enforced in all cases. In the present case, the names of the persons from whom the defendant received his information were not given. If they had been given, the opinion of .Chief Justice BEST in the case last referred to, is an unanswerable argument against

the justification. He says: "If the person receiving a libel may publish it at all, he may publish it in whatever manner he pleases; he may insert it in all the journals, and thus circulate the calumny through every region of the globe. The effect of this is very different from that of the repetition of oral slander. In the latter case, what has been said is known only to a few persons, and if the statement be untrue, the imputation cast upon any one may be got rid of; the report is not heard beyond the circle in which all the parties are known, and the veracity of the accuser and the previous character of the accused will be properly estimated. But if the report is to be spread over the world by means of the press, the malignant falsehoods of the vilest of mankind, which would not receive the least credit where the author is known, would make an impression which it would require much time and trouble to erase, and which it would be difficult, if not impossible, ever completely to remove." Again he says: "The statements published relative to the plaintiff do not concern the public; they are not disclosed in the course of the administration of justice; nor does it appear from the pleadings that the defendant, in making this virulent attack upon the plaintiff, has the excuse that he published the paper in his own defense; but before he used this statement in any manner, he was bound to satisfy himself that it was true; and he does not even say that he believed it. Before he gave it general notoriety by circulating it in print, he *should have been prepared to prove its truth to the letter;* for he had no more right to take away the character of the plaintiff, without being able to prove the truth of the charge he had made against him, than to take his property without being able to justify the act by which he possessed himself of it. Indeed, if we reflect on the degree of suffering occasioned by the loss of character, and compare it with that occasioned by the loss of property, the amount of the former injury far exceeds that of the latter. We are warranted in saying that the defendant has made a very serious charge against the character of the plaintiff, without being prepared to make it good; for if he could have proved that what he published was true, he might have put the truth of the state-

ment on the record as his justification." These observations apply with equal force to this case, except that the defendant does say that he believed the charges to be true, and there is probable cause for supposing that he did. There can be no pretense that they were privileged in their nature, that they concerned the public, or were elicited in the course of the administration of justice. The defendant does not attempt to justify them. He only says that he heard and believed them to be true. This is no justification. To justify, he must aver and prove that they were true in fact, and not that he heard and believed them to be so. If they had been preferred before the *bar* of the church, or that body authorized to remove the plaintiff from his position as pastor, there would have been some propriety in urging that they were made for a justifiable purpose, and the doctrine of malice in fact would have been applicable; but as it is, the defendant cannot escape from the imputation of malice which the law affixes to the act of publication, except by showing that the statements contained in the libel were true.

To a person desirous of tracing the changes and fluctuations of the law since the *Earl of Northampton's Case,* the following cases will be found of interest: *Maitland vs. Goldney,* 2 East, 426 ; *Woolnoth vs. Meadows,* 5 East, 463 ; *Kennedy vs. Gregory,* 5 Binney, 85; *Davis vs. Lewis,* 7 Term R., 17 ; *Smith vs. Stewart,* 5 Barr, 372 ; *Skinner vs. Grant,* 12 Vt., 456; *Larkins vs. Porter,* 3 Sneed, 681; *Gazette Co. vs. Timberlake,* 10 Ohio St., 548.

Judgment reversed, and a new trial awarded.

PAINE, J.   The defendant in this case published an article in which he said that the plaintiff had been charged with crimes in other places where he had formerly lived, and giving an account of an interview and conversation had between the plaintiff and himself upon the subject. To an action for libel he pleaded that he did have such an interview, and that all he had stated in the article was true. Upon the trial he introduced evidence amply sufficient to show, as the jury evidently found, that it was true—that is, not that the plaintiff had been guilty of the offenses mentioned, but that

*June Term, 1861.*

SANS
v.
JOERRIS.

December 30.

they had been charged upon him in the manner and with the results stated in the libel. Upon the trial, the question arose whether the defendant had set up a justification, and the court ruled that he had, and instructed the jury that if they found the facts stated in the libel to be true, they should find for the defendant. I confess that when I set out upon the examination of this question, I did so with a strong conviction that the ruling of the circuit court was correct. The distinction between stating that a man had committed a crime and stating simply that a third party had said that he had committed it, seemed to me too obvious to be overlooked. And I could not well believe that a rule of law had been established confounding the two different statements, and holding a party liable to the same consequences for publishing the one statement as for the other. But I am compelled to admit at the conclusion of my examination, that substantially such a rule has been established by the authorities, and that one who publishes that another has been accused of a crime cannot justify by proving the truth of what he said, that is that such other had been so accused, but only by proving that he was actually guilty, just as he would be required to justify in case he had alleged actual guilt. The distinction to which I have adverted was recognized at a very early day in respect to oral slander, and in the *Earl of Northampton's Case*, 12 Coke, 132, it was resolved that in a private action for slander of a common person, if I. S. publish that he hath heard J. N. say that J. G. was a traitor or a thief, in an action on the case, if the truth be such, he may justify. And the phrase "if the truth be such," in this resolution, did not mean if the party was in truth a traitor or a thief, that might be shown in justification; but if in truth the defendant had heard the charge, he might justify by showing that. But the cases have uniformly refused to extend this distinction to actions for libel, and it may, as is said in the opinion of the Chief Justice, be considered as virtually overruled. While I concede, therefore, the law to be as held in that opinion, I feel bound to declare that were I making the law, instead of deciding merely how it has been made, I should hold to the rule in the *Earl of Northampton's Case* both in slan

der and libel. For it seems to me that to say that one who merely states that another has made a charge of crime, does himself make that charge or assert it to be true, is doing violence to the obvious' meaning of language and to the ordinary understanding of mankind. And if in such a case he does not make the charge or assert its truth, why should he be bound to prove it? Why should the justification be required to go further than the allegation? If one says that another has said something, and is sued for slander, if he proves that the other did say it, he proves that his own statement was literally true. The other may have told a falsehood, but he told the truth. Where, therefore, he does not assume to say that what the other had said was true, but only that he had said it, how can he be justly held liable to an action for slander, though proving the exact truth of what he did say, because he did not prove the truth of something that he did not say. The reason given in the books is, that a person by "repeating slander" gives it a degree of credit. And if by the words "repeating slander" it were intended to include only those cases where the party asserts the truth of the slander, although he may at the time disclose where he first heard it, I should concede the entire correctness of the proposition. But those words are held to include cases where the party merely says he had heard the slander, and all distinction between the two cases seems in many instances to be confounded. Thus in *McPherson vs. Daniels*, 21 E. C. L., 72, Justice BAILEY, commenting upon the rule in *Northampton's Case*, says: "By repeating slander, a person, although he state at the time that he heard it from another, gives it a degree of credit, for the repetition of it imports a degree of belief in the truth of the slander. If I hear another say that A is a thief, and that B, though a person of bad character told him so, I am induced to think that the person who repeats it gives some credit to the statement." Now under this form of statement he might well be induced to think so, for A undertook to assert the slander as a fact, and afterwards give his authority for it. But although the learned judge evidently put his supposed case as one coming within the rule in *Northampton's Case*, which he was then reviewing,

it is clear that it is not within it. His supposed case is one where the party does repeat the slander as a truth ; the rule included only cases where the party alleged that he had heard it, without undertaking to say whether it was true or false. And the distinction seems to me to be too clear to have ever been for a moment lost sight of. And I cannot admit that one who merely asserts what is a fact, that some other has made a certain statement, does thereby give any credit to the truth of that statement. On the contrary, men are accustomed to discriminate acurately between the statement that a man has been guilty of a crime, and the statement that he has been charged with it. No one makes the former statement when it is false, except the malicious slanderer. All people are in the constant habit of making the latter when it is true, without any intent to slander or to impute actual guilt of the offenses of which the party may have been accused. A criminal charge is suddenly preferred against some of our acquaintances. We are surprised at it. We mention the fact in conversation with our friends, that such an accusation has been made. And unless we go further than merely to state that fact, I deny that we thereby give any credit to the truth of the accusation. Men do not so intend, and they are not so understood. And I cannot but think that the rule of law which holds the party liable in such cases as a slanderer, unless he will prove that the other was actually guilty, forcibly and falsely imputes to him an intention which he never had, and holds him liable for the consequences of an act which he never committed. If the rule is consistently maintained, I am unable to see why every one who mentions the fact that another has been arrested on a criminal charge, is not liable in slander unless he can prove actual guilt, nor why every editor who publishes the same fact, or states that an indictment has been found against any one, is not liable for libel unless he can prove the indictment to be true. The law has always been justly severe towards the slanderer and the libeller. I have no desire to relax its provisions against those who are really such. But I do object to a rule which arbitrarily and unnaturally forces him who innocently mentions the fact that another has

made an accusation, into the same position with him who maliciously and falsely made the accusation itself.

Wherever any one should adopt this form of expression as a mere cloak to cover an insinuation of actual guilt, he should of course be held liable as though the assertion were directly made. But I cannot reconcile it with principle to hold him so liable who has honestly stated the mere fact that an accusation has been made by another.

The distinction between the two statements is very clearly pointed out in the case of *McPherson vs. Daniels,* notwithstanding the apparent disregard of it in a portion of the opinion of Bayley, J. So also in *Bell vs. Byrne,* 13 East, 554. In that case the defendant was charged in the pleadings with having published a libel stating that the plaintiff had been confined in England on a charge of high treason. It appeared in proof that the libel stated that the Irish Attorney General had said so. And the plaintiff was non-suited for the variance. It was conceded in the arguments of counsel on both sides, that if the defendant had been merely charged with publishing that the Irish Attorney General had uttered the libel, he could have justified by proving that he had uttered it. The judges very fully notice the distinction between stating that a fact had occurred and stating only that another had said so. Lord Ellenborough said: "But I find that all through the publication it is given as the speech of the Attorney General, not taken upon himself to say that any such letter or fact did exist or had happened." So Bayley, J., said: "It is a very different thing to assert a fact as in the party's own knowledge, and to say that another, whom he names, has told him so; the persons who hear the one must conclude that the party pledges his own knowledge of the fact, which in the other case he does not." It is true the judges all say that either statement was a libel, but they added that it was a different kind of libel in the latter form, and open to a "different defense." After reading this case, I expected to find that the difference in the defense was that suggested in the arguments of counsel, and that where the defendant had only said that another had uttered the libel, he would justify by proving that it had been so uttered.

June Term,
1861.

But as already admitted, I think that by the subsequent authorities, no such difference in the defense exists, but the party is required to make the same proof to justify in the one case as in the other. But while conceding that to be the established law, I have felt bound to state my convictions as to the correctness of such an undiscriminating rule, which forces the whole community into the category of malicious vilifiers.