FALKNER and wife, Appellants, v. NORTHERN STATES
POWER COMPANY, Respondent. [Case No. 75–610.]
BAUER and wife, Appellants, v. NORTHERN STATES POWER
COMPANY, Respondent. [Case No. 75–611.]

*Nos. 75–610, 75–611. Argued September 7, 1976.
—Decided January 6, 1977.*
(Also reported in 248 N. W. 2d 885.)

For the appellants there were briefs and oral argument by *Matthew H. Quinn* of Racine.

For the respondent there was a brief by *Eugene R. Jackson* of Chippewa Falls; *Eugene C. Daly, Richard H. Porter* and *Foley & Lardner,* all of Milwaukee, and oral argument by *Mr. Daly.*

ABRAHAMSON, J.

## FACTS

Northern States Power Company plans to construct a large nuclear generating station in Dunn County, Wisconsin, to be called the Tyrone Energy Park. It is to consist of two independent units, each with a generating capacity of 1150 megawatts. The plant will employ cooling towers of the "wet" type, with cooling water to be drawn from the Chippewa river, approximately $1\frac{1}{4}$ miles away. At the time of trial it was intended that the first unit be operational in April, 1982, and the second in October, 1983. However, due to revised demand projections, it now appears that the first unit will be delayed until April, 1985, and the second until an indefinite later date.

The appellants are the owners of farm property which Northern States Power desires to condemn for purposes of constructing its power plant. Jurisdictional offers were served upon both the Bauers and the Falkners on January 25, 1974. Both were rejected, and the owners commenced actions to contest the right of the condemnor to condemn the property pursuant to sec. 32.06(5), Stats. The actions were tried together on July 29 and 30, 1974. It appears that there were united in this trial not only the two sec. 32.06(5) actions brought by the Bauers and

Falkners, but also the condemnation proceedings that had in the interim been instituted on petition of the Northern States Power Company under sec. 32.06(7), Stats. The record in this court does not contain the petitions or other papers relating solely to the condemnation proceedings instituted by the Power Company. It does not appear that anyone objected to this mode of proceeding, which had the effect of combining for trial the property owners' *actions* to contest the right to condemn with the determinations *by the judge* of the necessity of taking under secs. 32.06(7) and 32.07, Stats.

On June 2, 1975, some ten months after the trial, the circuit court rendered its memorandum decision, ruling against the owners. Between the trial and the court's decision, Northern States Power had requested leave to withdraw its claim to about two-thirds of the Falkner land which it had originally sought. The court granted leave, stating that it would have excluded the affected lands anyway. As to the remaining lands, the court found that the Power Company had the right to condemn, that there was a reasonable necessity for the condemnation of the lands and that there was no showing of fraud, bad faith, abuse of discretion or other excess of authority by Northern States Power Company.

Findings of fact and judgments were filed on November 5, 1975.

On September 30, 1975, ch. 68, Laws of 1975, became law. This Act, in general terms, prohibits construction of bulk electric generating facilities, such as the units here involved, unless a certificate of public convenience and necessity has been obtained from the Public Service Commission, and further provides that where such a certificate is necessary, no general right of condemnation shall exist until the certificate is granted. On November 18, 1975, the owners filed motions seeking to restrain further proceedings in condemnation on the ground that

the new law precluded the Power Company from condemning their property without a certificate of necessity since the condemnation commissioners had not yet acted and title had not passed to the Power Company as of the effective date of the new Act. These motions were denied by orders entered January 9, 1976. The orders provided that the hearing before the condemnation commissioners was to be held as scheduled. Appeals were taken from these orders and from the judgments of November 5, 1975.

By petition filed February 12, 1976, the owners sought this court's orders restraining further action to condemn their lands pending determination of their appeals. By order of March 12, 1976, the requested relief was granted, and the cases advanced to the September calendar. The cases have been consolidated for purposes of appeal.

## EMINENT DOMAIN PROCEDURE

A major revision of condemnation procedures under ch. 32, Stats., was accomplished by ch. 639, Laws of 1959. It is apparent that the legislature intended to create two independent proceedings relating to condemnation, an owner's action in circuit court under sec. 32.06 (5), Stats., and the condemnation proceeding before a judge under sec. 32.06 (7). From sec. 32.06 (5) it is clear that the two proceedings may go on simultaneously, as they in fact did in this case.

The owner's action must be commenced within forty days of service of the jurisdictional offer, while the condemnation proceeding may be brought at any time after the jurisdictional offer is rejected.[1] The owner's action

[1] See Report and Recommendations, Governor's (Wis.) Study Committee on The Problems of Land Acquisition (1958), p. 3; Fifth Draft, pp. 10, 23. Wis. Stats. Annot., Vol. 4A, Notes to 1959 Revision, pp. 289, 310.

is now the only manner in which issues pertaining to the condemnation may be raised, except for those of title and just compensation, and if the action is not timely commenced, the owners are barred as to all issues that might have been raised.[2]

Under sec. 32.06(7), Stats., a hearing is to be had on the condemnor's petition, not sooner than twenty days from the date of its filing. At the hearing, the judge will determine the necessity of taking if that duty is assigned to the judge under secs. 32.06(1) and 32.07, as it was in the instant case. From the last two sentences of

---

[2] *Weeden v. Beloit*, 22 Wis.2d 414, 126 N.W.2d 54 (1964). Under prior law, the owner had two alternatives. The owner could appeal from the award of the commissioners pursuant to sec. 32.11, Stats. 1957. This appeal was not subject to the strict limitation of cognizable issues now found in sec. 32.06(10), Stats. Of the former sec. 32.11 appeal, it was said in *Skalicky v. Friendship Electric Light & Power Co.*, 193 Wis. 395, 401, 214 N.W. 388 (1927):

"[W]hen such purely statutory condemnation proceedings reach the circuit court on appeal they are then, by force of [sec. 32.11], for trial *de novo* . . . upon any and all issues that can be properly framed or asserted upon the entire record as it then stands."

The second alternative was an independent action in equity, available where the sec. 32.11 appeal would come too late to protect the owner's rights. The injunction action would lie if it appeared (1) that there was a probability of the owner's recovering permanent possession of the land if he prevailed on his claims, and (2) that irreparable injury would result if the owner were limited to an appeal under sec. 32.11, Stats., and the condemnor were allowed to take possession in the meantime. *Ferguson v. Kenosha*, 5 Wis.2d 556, 562, 563, 93 N.W.2d 460 (1958).

It appears that the legislature intended the owner's action under sec. 32.06(5), Stats., to supplant, for all but the enumerated purposes, both the appeal from the commisioners' award under former sec. 32.11 and the equitable action allowed under the conditions of *Ferguson v. Kenosha, supra.* An owner is still entitled to an injunction if the conditions of that case are met, but it would be granted, either as a provisional remedy or in the final judgment, in the sec. 32.06(5) action itself. *See* Sec. 813.01, Stats.

sec. 32.06 (7) it appears that the end result of this hearing will be an order that either (1) determines that the petitioner is entitled to condemn the property or some portion thereof and assigns the matter to the condemnation commissioners for assessment of damages, or (2) determines that the petitioner does not have the right to condemn and refuses to assign the matter to the commissioners. This determination ends the judge's role in condemnation proceedings. If the judge rules against the condemnor, the order may be appealed directly to this court under the last sentence of sec. 32.06 (7). If the judge rules the other way and assigns the matter to the commissioners, no provision is made for appeal of this decision. The commissioners are to hear the matter as provided in sec. 32.08, make an award of damages, and file it with the clerk of the circuit court.[3]

## AUTHORITY TO CONDEMN FOR STATED PURPOSE

██ The owners claim that no statute authorizes Northern States Power to condemn their land for construction of its power plant. The power of eminent domain is an attribute of sovereignty which no private corporation may exercise except to the extent that the right has been delegated to it by the legislature. *Wisconsin Water Co. v. Winans*, 85 Wis. 26, 39, 54 N.W. 1003 (1893).

The Northern States Power Company bases its power of condemnation on sec. 32.02, Stats. 1973:

---

[3] Within sixty days of filing of the award, either party may appeal to the circuit court, but "the only issues to be tried shall be questions of title, if any, as provided in ss. 32.11 and 32.12, Stats., and the amount of just compensation to be paid by condemnor." Sec. 32.06 (10), Stats. The judgment rendered by the circuit court under sec. 32.06 (10) may be appealed by either party to this court. Sec. 32.06 (13), Stats.

"The following . . . corporations may acquire by condemnation any real estate and personal property appurtenant thereto or interest therein which they have power to acquire and hold or transfer to the state, for the purposes specified, in case such property cannot be acquired by gift or purchase at an agreed price:

" . . .

"(6) Any Wisconsin corporation furnishing gas, electric light or power to the public, for additions or extensions to its plant."

It is undisputed that we are dealing with a Wisconsin corporation furnishing electric power to the public. However, the owners claim that "plant" as used in the statute refers to a single existing facility for generating electricity and that the statute allows condemnation only to expand or extend that facility, not to construct an entirely new unit at a different location. The statute applies, they say, only to "properties abutting a present plant." The owners point out that condemnation statutes are to be strictly construed. *Herro v. Natural Resources Board,* 53 Wis.2d 157, 171, 192 N.W.2d 104 (1971), and cases cited.

The Company argues that the "plant" of any utility "is its entire physical plant consisting of dams, generating stations, transmission lines and all of the complex network of property, both real and personal that becomes the entire system."

Where non-technical words used in a statute are not specifically defined they are to be given their ordinary and accepted meaning, and this meaning may be ascertained from a recognized dictionary. *Town of Lafayette v. City of Chippewa Falls,* 70 Wis.2d 610, 619, 235 N.W.2d 435 (1975) ; *Edelman v. State,* 62 Wis.2d 613, 620, 215 N.W.2d 386 (1974). Webster's New International Dictionary (3d ed.) lists a number of definitions of the word "plant." Some are supportive of the owners' position:

"a factory or workshop for the manufacture of a particular product—a piece of equipment or a set of machine parts functioning together for the performance of a particular operation."

Other definitions are more consistent with the Company's argument:

"—the land, buildings, machinery, apparatus, and fixtures employed in carrying on a trade or a mechanical or other industrial business.
"—the total facilities available for production or services in a particular country or place.
"—the physical equipment of an institution."

In ascribing a meaning to the word "plant" as here used, it is settled that the word is to be considered in its context within the statutory section as a whole. *Omernik v. State,* 64 Wis.2d 6, 11, 12, 218 N.W.2d 734 (1974). A court will always reject an unreasonable construction of a statute where a reasonable construction appears, and this is so notwithstanding that the statute is to be strictly construed. *Id.; Volunteers of America v. Industrial Comm.,* 30 Wis.2d 607, 616, 617, 141 N.W.2d 890 (1966); *Guse v. Industrial Comm.,* 189 Wis. 471, 476, 205 N.W. 428, 208 N.W. 493 (1925).

We think the owners' construction cannot be maintained. The wording of the statute suggests either that "plant" is used in the broad sense, or that all electric utilities have but one generating facility. The latter is obviously incorrect. Nor does any rational basis appear for allowing condemnation to expand existing plants but not to create new ones. The result contended for by the owners would be unreasonable, and we find no indication in the statute that it was intended. Sec. 32.02(6), Stats. 1973, empowers public utilities to condemn land for construction of an electrical generating station whether or not such station abuts any of its existing buildings or facilities.

## PUBLIC USE OR PURPOSE

■ A taking for a use that is not public is unconstitutional and beyond the right of even the legislature to accomplish. *Wisconsin Water Co. v. Winans*, 85 Wis. 26, 54 N.W. 1003 (1893) ; *Schumm v. Milwaukee County*, 258 Wis. 256, 45 N.W.2d 673 (1951) ; *David Jeffrey Co. v. Milwaukee*, 267 Wis. 559, 66 N.W.2d 362 (1954) ; *Cincinnati v. Vester*, 281 U.S. 439, 50 S. Ct. 360, 74 L. Ed. 950 (1930).

The owners argue that the following uncertainties and contingencies might prevent construction of the power plant and that it cannot now be said that the takings are for a valid public use:

(a) Funds have not been obtained, nor is the specific source of the 1.5 billion dollars known;

(b) Many of the permits required by the Atomic Energy Commission, Public Service Commission, Department of Natural Resources, and Department of Industry, Labor and Human Relations have not been applied for or issued;

(c) Sufficient testing to apply for some permits has not been done;

(d) Building plans have not been completed;

(e) Environmental reports have not been completed;

(f) Participation by other utilities has not been confirmed either as to construction cost or usage;

(g) Public hearings are necessary;

(h) The plans have been changed since the trial to cut the size by one-half;

(i) The Board of Directors of NSP, Minnesota, have not made a final decision to go through with the plant construction.

The owners' position is not without support in Wisconsin law, at least in some respects. They rely principally upon *Wisconsin Water Co. v. Winans*, 85 Wis. 26, 54

N.W. 1003 (1893) ; *New Lisbon v. Harebo,* 224 Wis. 66, 271 N.W. 659 (1937) ; and *Schumm v. Milwaukee County,* 258 Wis. 256, 45 N.W.2d 673 (1951).

*Winans* involved the water company's attempt to condemn land for a pipeline running to the boundary of the city of Milwaukee, for the purpose of carrying water for sale to customers in Milwaukee from its springs in Waukesha. The taking was challenged on the ground, among others, that the company had not established that it had a legal right to conduct and distribute the water once it arrived in Milwaukee. This contention was upheld, the court concluding that under the circumstances no public use for the land appeared.[4]

---

[4] ". . . Here, as indicated in the foregoing statement, the petitioner only seeks to condemn for its pipe line from its springs in Waukesha, by way of Darling place, to the city limits of Milwaukee. There is nothing in the record showing any legal right in the petitioner to enter upon or condemn land in that city. It does not appear that the petitioner has secured, by way of contract or otherwise, the right to construct or maintain waterworks or to lay pipe therein, or to sell or dispose of the water so to be conveyed by pipes to the inhabitants of that city. For aught that appears, such pipe line may terminate at such city limits, or the water to be conducted through the same be there put to private use. There can be no public use, except in supplying the city or its inhabitants with water for the uses and purposes mentioned. Until the right to so supply the city or its inhabitants with water is secured, there can be no right to condemn. The declared purpose of the petitioner is to take the water from its springs, and convey it through the pipes to be laid to the city, and there to supply the city or its inhabitants. The transportation is purely incidental to such supply for such public use in the city. Without the right in the petitioner to so supply for such public use, the condemnation here sought, to lay such pipe, would necessarily be independent of such public use. It is entirely unlike a railroad, which is used by the public along the whole line. In the case at bar the right to so supply for such public use at the terminus gives character to the whole enterprise. We are forced to the conclusion that the showing made was insufficient to authorize such condemnation." *Wisconsin Water Co. v. Winans,* 85 Wis. 26, 42–43, 54 N.W. 1003 (1893).

The *New Lisbon Case* involved condemnation by the municipality for purposes of constructing a dam, lake and park. The appellants claimed the petition for condemnation was defective in failing to allege that the Public Service Commission had made the findings needed for construction of the dam. The court rejected the municipality's argument that the Public Service Commission could not make the findings before all the land to be flooded was acquired, or at least flowage rights secured, and continued:

". . . It is elementary that a municipal corporation may only exercise the power of eminent domain for some public purpose authorized by the statute or constitution. If condemnation of lands for a damsite and flowage were to be permitted prior to the issuance of a permit, which might conceivably never be issued, it is impossible for us to see how at the time of the condemnation proceedings the taking can be said to be for public purposes. The municipal corporation must be able to show at the time of its petition for condemnation that it has a right to construct a dam." 224 Wis. at 74.[5]

Finally, the *Schumm Case* was an appeal from a judgment enjoining condemnation of land for the lakefront

---

[5] The court quoted from *Minnesota Canal & Power Co. v. Pratt*, 101 Minn. 197, 112 N.W. 395, 403, as follows:

" 'The petition is presented to the court by a corporation which under the laws of the state is granted the power of eminent domain in aid of the specific enterprise described in the petition. . . . It will not do to say that these landowners are not interested in the matter of obtaining the consent of the United States government. Their property can be taken only for a public purpose and for the specific public purpose described in the petition. If the land is taken, it may never be used for that purpose, because the petitioner may not be able to obtain the necessary authority. It is not a mere formality granted upon application as a matter of course, as the petitioner must have learned from the history of the proceedings as stated in the briefs. The landowner has a right to demand that the petitioner allege and show that the works which it intends to construct with the aid of his land can be constructed under the existing laws.' " 224 Wis. at 74.

war memorial center in Milwaukee. The project was to be created by a nonprofit corporation established for this purpose. The county and the corporation executed what they called a "contract" to effectuate the plan. The court adopted the assumption, made by the trial court, that the requisite county board resolutions would be passed, and moved to a consideration of further issues. Citing *Winans* and *New Lisbon*, the court stated:

> "The right to condemn is an attribute of sovereignty and is often indispensable for the common good but it is, nevertheless, so harsh a right that even the sovereign may not exercise it unless the public purpose is clear and the public use, for which the private owner is to be compelled to surrender his property, is assured." 258 Wis. at 261.

The court stated that since the county did not itself intend to construct the project, but intended that the corporation do so, an enforceable contract to that end was required. The court then analyzed the contract, emphasizing the several escape clauses, and said:

> "The matters which the present contract leaves open for the future agreement, or disagreement of the contracting parties are so many and so important to certainty that the public purpose will be fulfilled that from the standpoint of either the plaintiffs or the public it is less a contract than it is a prospectus . . . ." *Id.* at 263.

The court also found significant the uncertainty of acquiring additional funds and the need for the county and the corporation to agree upon plans and specifications not yet in existence before construction could go ahead. In conclusion, the court said:

> ". . . If streets cannot be vacated, if money cannot be raised, if plans and specifications to be prepared in the future are not agreed upon, the county's only recourse is to abandon this undertaking. Meantime, if condemnation is permitted, private persons will have been ousted from

their homes and business premises. It will not do. While such uncertainties lie between the proposed and the completed project we must say, as we said in the *New Lisbon Case, supra* (p. 74), '. . . it is impossible for us to see how at the time of the condemnation proceedings the taking can be said to be for public purposes.' " *Id.* at 264–265.

The owners draw from these cases the conclusion that a public use can only exist in this state when there are no contingencies that may prevent some or all of the land being sought from being put to public use. They do not argue that the various certificates and permits the Power Company will ultimately need are actually conditions precedent to condemnation. Indeed, sec. 196.49 (4), Stats., expressly provides that the Public Service Commission's certificate of authority is not a condition precedent to condemnation under ch. 32, Stats. The owners do argue that "we must look at the question is it 'conceivable,' 'possible' " that their lands might not be used.

We are of the opinion that the test advocated by the owners is too extreme to be sustained. There will always be some possibility that a planned improvement will not be completed and put to the use intended. The test cannot be whether it is possible, whether it is conceivable that the project would fail. The test must be whether there is a reasonable assurance that the intended use will come to pass. If there is reasonable probability that the public utility will comply with all applicable standards, will meet all requirements for the issuance of necessary permits, and will not otherwise fail or be unable to prosecute its undertaking to completion, there is a right of condemnation.

*Winans* dealt with a problem quite different than the one in this case. The water company had not shown that it had or would obtain the right to distribute or sell the water once it got to Milwaukee. The analogue here would

be if the Power Company had no right to sell power to the public, which clearly is not the case. It is certain that the output of the Tyrone Energy Park will be sold to the public, an undisputedly legitimate public use. *Winans, New Lisbon* and *Schumm* should be read to require reasonable assurance of public use. The uncertainties in these cases were so numerous and of such a substantial nature that no reasonable assurance existed.

It is only if Northern States Power Company cannot reasonably expect to achieve its public purpose that its right to take land by condemnation should be denied. *See Concerned Citizens, United, Inc. v. Kansas Power & Light Co.,* 215 Kan. 218, 523 P.2d 755, 769–771 (1974); *State ex rel. Harlan v. Centralia Elec. Ry. & Power Co.,* 42 Wash. 632, 85 P. 344 (1906); *Sellors v. Concord,* 329 Mass. 259, 107 N.E.2d 784 (1952); *Seadade Industries v. Florida Power & Light Co.,* 245 So.2d 209 (Fla. 1971).

Turning to the evidence, the testimony does not show any significant doubt that funds can and will be raised.[6] The Company has already spent $11–$12 million on the project. Although there was a question whether the Company has formally committed funds to cover the full cost of construction there was no real evidence that the Company lacked the commitment to complete the project.

■ Francis J. Kripps, Vice President of Power Supply of Northern States Power Company, was examined at some length as to the various permits that would be required. He stated that application had been made to the Public Service Commission for a certificate of convenience and necessity and that as of May, 1974, a five-volume environmental report and a seven-volume preliminary

---

[6] In *Wisconsin Chapter House Asso. of Phi Delta Theta v. Regents,* 260 Wis. 206, 211, 50 N.W.2d 469 (1951), this court held that it was not necessary that the condemnor show it had the funds on hand to complete the project at the time of condemnation. To the same effect, *Seadade v. Florida Power & Light Co.,* 245 So.2d 209, 215 (Fla. 1971).

safety analysis report had been submitted. Further reports and testing are necessary. The Commission had held a public hearing, but it had not as yet rendered a decision. These reports were also submitted to the Atomic Energy Commission. It was also brought out that permits were needed from DNR, from DILHR, and from other agencies as well, for some of which applications had not yet been made. Several public hearings must yet be held. Kripps was asked several times whether it was possible or conceivable that some of these permits would not be granted. He answered that it was possible, "but we think there is a high probability all of them will be issued." He further testified that he knew no reason why all permits would not be granted. No evidence was adduced to suggest that any necessary permit would not be granted. The evidence amply supports the conclusion that a public use for the lands in question is reasonably assured.

## NECESSITY OF TAKING

■ The question whether it is necessary to take particular property for public use has been held to be inherently a matter for the legislature.

". . . '[T]he necessity, expediency, or propriety of exercising the power of eminent domain, and the extent and manner of its exercise, are questions of general policy, and belong to the legislative department of the government.' " *Winans, supra,* 85 Wis. at 39.[7]

The legislature of course may delegate the power of eminent domain, *Winans, supra,* 85 Wis. at 39, and usually does so.

---

[7] To the same effect are *Swenson v. Milwaukee County,* 266 Wis. 129, 131, 63 N.W.2d 103 (1954); *Ford v. Chicago & Northwestern R.R.,* 14 Wis. 663 (*609), 671 (*617) (1861); *Klump v. Cybulski,* 274 Wis. 604, 612, 81 N.W.2d 42 (1957); 1 Nichols, *Eminent Domain,* sec. 4.11, p. 4–138 (3d ed. 1976).

■ In determining necessity neither the legislature nor its delegate is limited to takings that are absolutely or indispensably necessary. Necessary in this context has been construed to mean reasonably necessary, reasonably requisite and proper for the accomplishment of the public purpose for which the property is sought; necessary does not mean absolutely imperative. *Klump v. Cybulski,* 274 Wis. 604, 614, 81 N.W.2d 42 (1957); *Chicago & N. W. Ry. v. Racine,* 200 Wis. 170, 175, 227 N.W. 859 (1929).

■ Notwithstanding its legislative character, the determination of necessity by the legislature or by its delegate is not completely immune from review. There is a limit beyond which the legislature (or its delegate) cannot go, and the issue of necessity is one that the court can review in an owner's action under sec. 32.06(5), Stats. However, the scope of review is narrow. Our decisions establish that a court will not disturb a determination of necessity in the absence of fraud, bad faith or gross abuse of discretion; the determination of the necessity of taking will be upheld if there is reasonable ground to support it.

Mr. Chief Justice CURRIE, writing for the court in *Banach v. Milwaukee,* 31 Wis.2d 320, 327, 328, 143 N.W.2d 13 (1966), put the matter as follows:

"While determination of necessity of taking made by the body authorized by the legislature to make it is not beyond the pale of judicial review, such review operates within very narrow limits. In *Swenson v. Milwaukee County* [*supra* this opinion] this court quoted with approval a statement from American Jurisprudence that courts normally will not disturb such a determination in the absence of fraud, bad faith, or gross abuse of discretion. This court has held that the determination made of the necessity of taking is beyond question if there is any reasonable ground to support it."

In *Klump v. Cybulski, supra,* the court said a legislative determination of necessity is beyond question by any court if there is reasonable ground to support it, and added:

"Where, as here, the application is for a right of way for an electric line, 'the petitioner shall determine the necessity.' Sec. 32.07 (2), Stats. . . . The right to locate the power line is given to the Power Company and the location cannot be challenged unless that right is arbitrarily or oppressively exercised. . . . A court will not interfere with the choice unless necessary to prevent an abuse of discretion by an attempted taking in utter disregard of necessity for it. . . .

". . . Judicial interference . . . would at most be warranted only by a convincing showing that the determination is unreasonable, arbitrary, or not made in good faith." 274 Wis. at 612.[8]

In *Herro v. Natural Resources Board,* 53 Wis.2d 157, 170, 192 N.W.2d 104, 227 N.W.2d 456 (1971), this court stated its power of review as follows:

" '. . . The expediency of constructing a particular public improvement and the extent of the public necessity therefor are clearly not judicial questions; but it is obvious that, if property is taken in ostensible behalf of a public improvement which it can never by any possibility serve, it is being taken for a use that is not public, and the owner's constitutional rights call for protection by the courts.' 1 Nichols, *Eminent Domain,* sec. 4.11."

While the standard of review of the determination of necessity has been thus defined, its application within the owners' actions in this case presents certain conceptual difficulties resulting from the procedural provisions of ch. 32, Stats. Where the determination of necessity is assigned by sec. 32.07 to the condemning authority there

---

[8] *See also Lehmann v. Waukesha County Highway Comm.,* 15 Wis.2d 94, 97, 98, 112 N.W.2d 127 (1961); *Branch v. Oconto County,* 13 Wis.2d 595, 599–601, 109 N.W.2d 105 (1961).

is no problem; the condemnor will have made its determination of necessity before serving the jurisdictional offer, and such determination may be subject to judicial review in an action brought thereafter under sec. 32.06 (5). However, in other cases the determination of necessity is assigned by sec. 32.07 to the judge, and as we have pointed out, this determination need not have been made as of the time an owner's action is brought under sec. 32.06(5). The owner's action is clearly not intended to be a review of proceedings before the judge. Where necessity is to be determined by a judge, the circuit court in a sec. 32.06(5) action thus may be presented with something of a dilemma. It cannot determine necessity, for that is a legislative question which may not be resolved by judicial means absent statutory authority, and sec. 32.07 commits that question to the judge acting under sec. 32.06(7), not to the court under sec. 32.06(5). Nor can the court review the judge's determination of necessity, because that determination may not yet have been made; and even if it has, the proceedings under sec. 32.06(5) are not a review of the determination made by the judge. Thus it appears at first blush that the circuit court is armed with a standard of review but is without a determination to which the standard may be applied.

This problem is inherent in the statutes. However, it is a problem more of form than substance. We do not find in ch. 32 an intent to inhibit the owner's right to judicial review of condemnations in cases where the determination of necessity is assigned to the judge under sec. 32.07, Stats. Nor do we believe that the legislature intended the scope of review available under sec. 32.06(5) to differ in such cases from the standard applied where the condemnor determines necessity.

Whether the formal determination of necessity is made by the condemnor or by the judge, the condemnor, as delegatee of the power of eminent domain, is under a

duty to attempt the exercise of this power only under legally proper circumstances. In either case the condemnor is obligated to exercise its judgment such that condemnation is not initiated unless the property sought is reasonably necessary to the accomplishment of a valid public purpose. As a practical matter, the condemnor's invoking the power of eminent domain constitutes an implicit decision that the taking is necessary for a public purpose, and this decision is reviewable in an owner's action under sec. 32.06(5), Stats. The question on such review is whether the condemnor has reasonable ground for the decision to seek condemnation, or whether that decision constituted fraud, bad faith or a gross abuse of discretion. We are of the opinion that this result best harmonizes the procedural framework established by statute with settled principles regarding the legislative and judicial functions in respect of the power of eminent domain.[9]

A. *The Tyrone Energy Park as a Whole.*

The owners here do not dispute that condemnation properly may be sought for public use in the reasonably foreseeable future[10] as well as for a use that is immediate. They claim, however, that the Power Company's future needs for electrical energy are insufficient to justify building the Tyrone facility and that the decision to condemn for construction of the facility is therefore so lacking in necessity as to be without reasonable basis and an abuse of discretion.

---

[9] Brief note may be taken of the existence of an additional potential problem resulting from the dual proceedings created by Statute (the owner's action under sec. 32.6(5) and the condemnation proceedings under sec. 32.06(7)). Duplication of effort and expense may result if separate trials are held. We see no objection to consolidating the two proceedings for trial, as was done in the case at bar, provided the identities of the proceedings are preserved.

[10] *Banach v. Milwaukee,* 31 Wis.2d 320, 328, 143 N.W.2d 13 (1966); 1 Nichols, *supra,* sec. 4.11[2], p. 4–170, *et seq.*

Because of the substantial delay between the decision to build a power plant of the size here involved and the time at which it can be placed in service, power companies must necessarily base their decisions to build new facilities upon projections of demand running a number of years into the future. In this case Northern States Power introduced projections showing that by 1985 it will have a shortage in both generating capacity and energy production capability.[11] The testimony indicated that the latter deficiency is here the more serious, as a result of the fact that much of the Company's present generating capacity is in the form of peak load facilities. As explained at the trial, peak load units tend to have relatively high fuel costs and are designed to be operated primarily during periods of peak electrical demand, while base load facilities use low cost fuels and are generally operated on a twenty-four hour per day basis. Peak load units thus operate at lower sustained availabilities than base load units. The Power Company's evidence tended to show that by 1985, when the first Tyrone unit is scheduled for operation, there will be a substantial need for additional base load energy production capability. The Tyrone units are base load facilities intended by the

---

[11] The meaning of these terms, as used in this case, was explained at the trial: Generating capacity is the ability to produce power, measured here in megawatts (one megawatt=1,000,000 watts). Generating capacity requirements represent maximum power demanded by the Power Company's customers plus a percentage allowance for reserve. Energy generation, as here used, represents the integral of power over an entire year, measured in gigawatt hours. If the utility produces 1,000 megawatts of power for one hour, it has produced 1,000 megawatt-hours of energy, which equal one gigawatt-hour, and so on. Capacity and energy figures do not correlate exactly. Energy requirement figures reflect that power is not always demanded by customers at peak rates, while energy production figures reflect the fact that the sustained availability of power plants will always be something less than 100 percent of rated capacity.

company to meet this need. We are of the opinion that a reasonable ground exists for the Power Company's decision to construct additional base load capacity.

It is true that the first Tyrone unit to come in service will more than make up for shortages predicted then to exist. However, utilities must possess considerable discretion in determining the size of units to be built. We do not think the amount of excess capacity that may result in 1985 from construction of the first Tyrone unit was shown to be of such magnitude as to be unreasonable.

The completion date for the second unit to be constructed at the Tyrone site is now said by Northern States Power to be indefinite.[12] The owners rely heavily upon this as indicating the lack of any reasonable need to condemn their lands. We think that it was not improper for the Power Company to condemn on the basis of a two-unit complex notwithstanding indefinite timing as to the second unit. This is so because the evidence tended to show that the amount of land required for a two-unit facility is not substantially greater than that needed for a single unit.

The evidence indicated that a principal determinant of the land area needed is the size of the exclusion area. At this point it suffices to say that the exclusion area is a kind of buffer zone that the Nuclear Regulatory Commission (NRC) requires be maintained around a nuclear reactor. The area is described by a radius about the reactor calculated in accordance with guidelines

[12] The two units were originally scheduled for operation in 1982 and 1984, respectively. The current schedule reflects a downward revision in demand forecasts resulting, according to testimony at the trial, from the effects of recent concern over energy conservation. Though the present time schedule was not announced until after the trial herein, the demand projections presented at trial already reflected decreases in expected power requirements.

promulgated by the NRC.[13] According to undisputed testimony at the trial, where two independent reactors are involved, as here, the exclusion area for the two is found by determining it for each reactor on an independent basis, which results in a circle centered on each reactor, and then laying in common tangents to "flatten" the sides. In the case at bar, the exclusion area for each reactor was calculated to be a circle with radius of .913 mile, and the two reactors are to be located 440 feet apart. The exclusion area for the two reactors, then, is the area that would be produced by splitting a circle 1.826 miles in diameter in half, moving the semicircles apart 440 feet, and filling in the thin rectangle between them.

Thus, the undisputed evidence establishes that the additional land area called for by the planned second unit is small in comparison to the total area needed and that locating the units together will result in a large saving of land over what would ultimately be required if the Power Company limited the Tyrone facility to a single reactor and located a second unit elsewhere at a later date. It is only the need for the second reactor that is indefinite at this time. We think that the Power Company's conduct in planning and condemning on the basis of a two-reactor facility cannot be said to be a gross abuse of discretion. The owners' objections based upon an asserted lack of necessity for the Tyrone Energy Park as a whole cannot be sustained.

B. *Necessity for Taking These Lands.*

Assuming that the Power Company has a right to condemn for the proposed facility, the owners claim that there is nevertheless no need for taking any interest in their land outside the exclusion area and that an easement is all that may be condemned as to lands within.

---

[13] The exclusion area here was defined by calculations made by the Power Company, the accuracy of which is not here in dispute, in accordance with NRC guidelines. *See* 10 CFR, sec. 100.11.

In *Czarnik v. Sampson Enterprises, Inc.*, 46 Wis.2d 541, 175 N.W.2d 487 (1970), it was said:

"[T]he general rule is that only such an estate in the property sought to be acquired may be taken as is reasonably necessary for the accomplishment of the purpose for which the proceeding is brought."

In *Klump v. Cybulski, supra,* 274 Wis. at 613, the court said:

". . . the company could take the fee title if it needed it. No reason is apparent why it could not take any interest less than that, as to which there is reasonable basis for a determination of necessity."

The matter was put as follows at 26 Am. Jur.2d, *Eminent Domain,* sec. 133:

"In the absence of any definition of the estate which the grantee of the power is authorized to acquire or any limitations in the granting statute, no more property can be taken than the public use requires; this rule applies both to the amount of property and the estate or interest in such property to be acquired by the public."[14]

It is admitted that under current plans no building, transmission line or other physical structure would be located on the Bauer and Falkner lands. A small corner of the Falkner property and a much larger part of the Bauer property fall within the exclusion area. The owners do not dispute here that the Company may condemn some interest in this property, but they claim an easement is enough. The Company contends, and the trial court found, that the Company needed complete control over the exclusion area, and that a fee interest was therefore appropriate.

---

[14] The granting statute here contains no specification or limitation, referring generally to condemnation of "any real estate . . . or interest therein." Sec. 32.02, Stats.

"Exclusion area" is defined by NRC regulation at 10 CFR, sec. 100.3(a):

" 'Exclusion area' means that area surrounding the reactor, in which the reactor licensee has the authority to determine all activities including exclusion or removal of personnel and property from the area. This area may be traversed by a highway, railroad, or waterway, provided these are not so close to the facility as to interfere with normal operations of the facility and provided appropriate and effective arrangements are made to control traffic on the highway, railroad, or waterway, in case of emergency, to protect the public health and safety. Residence within the exclusion area shall normally be prohibited. In any event, residents shall be subject to ready removal in case of necessity. Activities unrelated to operation of the reactor may be permitted in an exclusion area under appropriate limitations, provided that no significant hazards to the public health and safety will result."

Neither the Bauers nor the Falkners reside within the exclusion area. Bauer testified that such part of his land as is within the exclusion area is used for growing hay and corn. Francis Falkner, a son of the Falkners who own the other land in question, testified that the part of it within the exclusion area is woods, used for no purpose "other than gathering timber and so on."

The trial court's basis for concluding that a fee interest rather than an easement was necessary within the exclusion area was some ambiguous testimony by Mr. Bauer to the effect that he would not voluntarily allow the Power Company "to determine all activities" within the area. The implication is that had Mr. Bauer evinced a more cooperative attitude on the witness stand a different result might have followed.

We are of the opinion that the trial court rested its decision on an inadequate basis. The quantum of estate

taken by the condemnor should not turn on the stated willingness of one owner to accede to the condemnor's unspecified future demands. Mr. Bauer was not the only owner of the property, and in any case, a mere statement by the owners that they would evacuate on demand is no guarantee that they would do so in fact. Nor could such a statement be expected to have any effect upon other persons who might be on the property at any given time with or without the owner's consent. Furthermore, if the owners' stated intent were controlling, every time the fee interest changed hands the utility would have to examine the new owners to learn their intentions and institute new proceedings to take the fee if their answers proved unfavorable.

Nevertheless, we think the trial court's conclusion that an easement is insufficient should be sustained, but on a different basis. In the unlikely event that a serious nuclear accident occurred, the danger nearby might be extreme. Assuming that all persons on the land would comply with an order to evacuate, there still remains the problem of transmitting the order to them, and the question whether they could then leave quickly enough to avoid the danger which prompted issuance of the order. We think that the degree of control over the exclusion area contemplated by the regulation is such to make a fee interest therein appropriate.

As evidence that an easement is sufficient the owners point out that 10 CFR sec. 100.3(a) allows a fair amount of activity to go on within an exclusion area. However, these provisions follow the general requirement that the reactor licensee have "the *authority to determine all activities* including exclusion or removal of personnel and property from the area." We have not found any administrative or judicial interpretation of this regula-

tion. We think that under a reasonable construction of the rule, those of its provisions which permit certain activities in an exclusion area are not intended to detract from the utility's need for authority to determine all activities therein; the permitted activities are enumerated to identify what the utility may allow to be done within the area in the exercise of its authority.

It is arguable that an easement literally complying with the requirement that the Power Company be given "the *authority to determine all activities*" in the exclusion area would leave so little right in the owners as to approach a fee title in the company.

We conclude that as to the lands within the exclusion area the Power Company has a large measure of discretion in determining the area and estate of land it needs, and if it chose to fulfill the requirements of the federal regulation by acquiring the entire exclusion area in fee we cannot say that this discretion has been abused.

As to lands outside the exclusion area, the only justification the Power Company offers is the detrimental effect thereon of operation of its cooling towers. The Company asserts that noise from the cooling tower fans and moisture released from the towers may result in complaints, and in claims that this was in effect a total taking of the property. Avoidance of such complaints and claims is offered as a reasonable basis for the taking.

Francis J. Kripps. Northern States' Vice President of Power Supply, testified as to the adverse effects of cooling towers. He stated that the noise they produce would be a disturbance to people living or working nearby. The noise is from a large motor-driven fan in each cell of the towers, which pulls air through the cell and ejects it from the top. He testified that he has heard the noise from the towers at the Prairie Island (Minnesota) plant, that the noise drops off in intensity as one gets away from the tower, and that on a quiet night it would be a

matter of two miles before one could not hear the noise at all. Kripps said the towers planned for the Tyrone facility could be compared to those at Prairie Island, but that "you must necessarily make allowances for the difference in size of the towers." The Tyrone towers are to be approximately twice as large as those at Prairie Island.

Kripps also testified as to the effect of moisture evaporating from the towers. About 650,000 gallons of water would evaporate per hour with one unit operating at full rated output. Kripps said that this moisture "in some cases comes back down in the form of excess moisture other than would normally be in the atmosphere. During some conditions, this moisture actually freezes onto trees or structures or plants." He described a further effect: "[T]hese droplets of moisture carry with them solids or salts and they deposit on the trees or buildings or plants on which the droplets fall." As to the range of the moisture effects, Kripps testified that at the Prairie Island plant he observed a vapor plume that arises from the towers and, under certain wind conditions, is carried back to the ground in the direction the wind is blowing. He testified that the plume does not extend to the same distance as the noise is audible. In his observations of the Prairie Island facility the plume disappeared within about a half mile of the tower, but approximately twice as much water will evaporate from the towers at the Tyrone plant.

Kripps was then permitted to testify as to his opinion of the effects upon the Bauer and Falkner properties of the noise and moisture. Kripps' opinion was based upon his personal knowledge of the lands in question and the planned facility and his close observation of four other plants employing cooling towers, over the period since 1949. Kripps stated his opinion as follows:

"The effects will be an excessive amount of moisture on the property, on the trees, crops, buildings, under

conditions of cold weather this will appear as ice formations. There will also be a certain amount of solids or salts deposited as this moisture is carried onto these properties, and there will be in my opinion an excessive amount of noise on particularly the Bauer property."

■ Although Kripps' testimony may be subject to challenge—especially as to the more remote sections of both the properties—the owners did not produce any contradictory evidence, and nothing in the record would render Kripps' testimony incredible as a matter of law. The probability of serious adverse effects upon the owners' property was sufficiently established to provide reasonable ground for the taking. The owners' contentions attacking necessity for condemnation of their lands cannot be sustained.

## CH. 68, LAWS OF 1975

The final issue in this case is presented by the circuit court's order of January 9, 1976, denying the owners' motion to restrain further proceedings to condemn their lands on the ground that ch. 68, Laws of 1975, barred condemnation until the Public Service Commission issued a certificate of necessity.[15]

---

[15] This case was tried in July, 1974, and the court's memorandum decision was handed down on June 2, 1975; judgment was not entered until November 4, 1975, after the effective date of the Act. On November 18, 1975, the owners moved the circuit court for an order restraining further proceedings to condemn their lands on the ground that the new Act barred condemnation until the certificate was granted. The effective date of ch. 68 as a whole was September 30, 1975. Sec. 11 of the Act, entitled "Implementation," provides in part as follows:

"To provide for an orderly implementation of the procedures outlined in this act, the following transitional schedules shall be in effect:

". . .

"(3) Section 196.491(3) of the statutes shall be effective immediately, except:

Ch. 68, Laws of 1975, is the so-called power plant siting bill. This law effected substantial changes in the entire process by which the state regulates the siting and construction of power plants and high voltage transmission lines. Of principal interest here is the newly created sec. 32.03(5)(a), Stats., which provides that if an electric utility is required to obtain a certificate of public convenience and necessity under sec. 196.491, also newly created,

". . . no right to acquire real estate or personal property appurtenant thereto or interest therein for such project by condemnation shall accrue or exist under s. 32.02 or 32.075 until such a certificate of public convenience and necessity has been issued."

The new Act did not repeal sec. 196.49(4), Stats.,[16] which therefore will continue to govern except in those instances in which a certificate under new sec. 196.491 is required.

It is clear that the Tyrone Energy Park is a "bulk electric generating facility" under sec. 196.491(1)(a), Stats., and therefore a "facility" under sec. 196.491(1)(e). A certificate of public convenience and necessity would therefore be required under sec. 196.491(3), if the new Act is effective with respect to Tyrone Energy Park.

The owners do not challenge the trial court's finding that the Power Company applied for a certificate of

" . . .

"(b) That section 196.491(3) of the statutes, as created by this act, does not apply to the construction of facilities for which application for a certificate of authority under section 196.49 of the statutes has been made by one or more of the proposed owners prior to the effective date of this act, except that section 196.491 (3)(d) to (6) of the statutes . . . shall apply to those facilities which require a certificate under section 196.49, 1973 Stats."

[16] Sec. 196.49(4), Stats., provides in part: "The certificate issued, hereunder, shall not be a condition precedent to the exercise of eminent domain under ch. 32."

authority under sec. 196.49, Stats., before September 30, 1975. Accordingly, under the implementation provision of sec. 11(3)(b) (footnote 15, *supra*) only paragraphs 2 to 6 of sec. 196.491(3)(d) apply to the new facility here. These paragraphs set forth certain criteria to be followed by the commission in passing on applications for certificates under the new Act. The intent of sec. 11(3)(b) was simply to require the PSC to apply these criteria in passing on applications for certificates of authority filed under sec. 196.49, Stats., before September 30, 1975.

Sec. 32.03(5), Stats., as revised by ch. 68, does not apply; sec. 196.49(4), Stats. 1975, does, and the certificate is declared by that section not to be a condition upon the right to condemn. The owners appear to argue that because sec. 196.491(3)(d) 2 to 6 apply, all of sec. 196.491(3) applies, when the implementation provision clearly provides that it does not.

*By the Court.*—Judgments and orders affirmed.

BEILFUSS, C. J. and DAY, J., took no part.