Earl C. KIPLING and Mary Kipling, Appellants,

v.

**CITY OF WHITE PLAINS, Kentucky, Appellee.**

No. 1999–CA–002180–MR.

Court of Appeals of Kentucky.

Nov. 21, 2001.

Discretionary Review Denied by Supreme Court Aug. 14, 2002.

---

Daniel N. Thomas, Hopkinsville, KY, for appellants.

Kenneth W. Humphries, Hopkinsville, KY, for appellee.

Before GUIDUGLI, HUDDLESTON and JOHNSON, Judges.

*OPINION*

GUIDUGLI, Judge.

Earl C. Kipling and Mary Kipling (the Kiplings) appeal from various orders of the Hopkins Circuit Court which granted an easement across their farm to the City of White Plains (the City) for the purpose of installing a water line. We affirm.

Due to the adverse effects of strip mining operations in Southern Hopkins County some twenty years ago, nineteen households in the Mount Carmel area of the

county lost their water supply. The Kentucky Division of Abandoned Mine Lands (AML) studied the situation and set aside $350,000 in funds to replace the water supply to these homes. A decision was made to extend the City's water and sewer lines approximately six miles to the Mt. Carmel area.

The Kiplings own a 275-acre farm in Hopkins County, Kentucky. Although the farm is outside the City's limits, it abuts the City's municipal boundary and is bordered by Mt. Carmel Road. Some of the homes which would benefit from extension of the water line are across Mt. Carmel Road from the Kiplings' farm.

In July 1994, the Kiplings filed a petition with the Hopkins County Soil and Water Conservation District Board of Supervisors (the Board) seeking to have their property declared an agricultural district pursuant to KRS 262.850.[1] The Board recommended that the petition be approved, and the Kentucky Soil and Water Conservation Commission (the Commission) ultimately approved the petition.

On April 22, 1998, the City filed a verified petition with the trial court seeking to condemn a portion of the Kiplings' farm to obtain an easement for the purpose of constructing a sewer and water line across the farm.[2] Specifically, the City sought to condemn a strip of land running approximately 3,400 feet parallel with the Mt. Carmel Road. Funding for the utility lines was to come from several grants from the AML, the Farmers Home Administration and the Kentucky Division of Local Government. At this point in time, the City was not contributing money to the construction of the utilities.

Following receipt of the petition, the Kiplings forwarded a copy of it to the Board pursuant to KRS 262.850(16), which states:

> Any member of an agricultural district who has received a summons of condemnation proceedings being instituted concerning the member's land located in the district may request the local soil and water conservation district board of supervisors to hold a public hearing on the proposed taking of land. However, a hearing under this section shall not be held if the petitioner is a utility as defined in KRS 278.010(3) and obtained a certificate of convenience and necessity as required by KRS 278.020(1).[3]

In the letter accompanying the copy of the petition, the Kiplings asked the Board to hold a hearing pursuant to KRS 262.850(16) "for the purpose of approving

1. KRS 262.850(2) provides that "[it] is the policy of the state to conserve, protect and to encourage development and improvement of its agricultural lands for the production of food and other agricultural products." To that end, KRS 262.850(3) establishes local conservation district boards of supervisors and the State Soil and Water Conservation Commission to further this purpose. Under KRS 262.850(4), (7) and (13), any person who owns a parcel of at least 250 contiguous acres of agricultural land may petition the local board of supervisors to declare the land an agricultural district. The local board of supervisors reviews and evaluates the petition under guidelines contained in KRS 262.850(6) and makes its recommendation to the Soil and Water Conservation Commission, which then either approves or denies the petition.

2. Because of deficiencies with the original summons issued along with the petition, new summonses were subsequently issued and served on the Kiplings on July 4, 1998. In an order dated July 29, 1995, the trial court quashed the initial summons and accepted the July summons.

3. It is undisputed that the exceptions contained in KRS 262.850(16) do not apply in this case.

or denying the condemnation of land within the Agricultural District[.]"[4]

On May 21, 1998, the trial court entered an order appointing three Commissioners to determine just compensation for the taking of the Kiplings' land. On July 2, 1998, the Commissioners filed their report wherein they recommended that the Kiplings be awarded $500. In a letter accompanying the report, the Commissioners stated that:

> the advantage of sharing a water line available along Mr. Kiplings's road frontage would greatly outweigh any inconvenience, but due to any damage which might occur to his crops, we are making this award. We also feel that having a ser [sic] line on his property should also be an asset to him.

> Therefore, we are awarding him $500.00 (R) based on approximately 1.38 acres of land used in permanent and temporary easements × 150 bushels of corn per acre × $2.57 per bushel. This equation was arrived at from information obtained from the U of K extension office.

On July 20, 1998, the Kiplings filed a motion to quash, dismiss, and exceptions with the trial court.[5] In regard to the motion to quash, the Kiplings maintained that they were not served with a copy of the Commissioners' award. As to the motion to dismiss, the Kiplings maintained that because their land was an agricultural district:

Pursuant to the provisions of KRS 262.850(16), the determination of the right of condemnation for the utility herein has been delegated by the Legislature to the "Board," and this Court lacks the jurisdiction to otherwise consider the merits of the condemnation of the Defendant's property within the agricultural district.

In the alternative, the Kiplings asked the trial court to hold the matter in abeyance pending a hearing and entry of a decision by the Board, "and if that 'Final Decision' of the 'Board' is to deny the proposed condemnation of the real property ... then to confirm that 'Final Decision,' and to dismiss the Petition." As to their exceptions to the Petition, the Kiplings maintained that (1) the City's action was "arbitrary and capricious, and ultra vires; (2) the City could not condemn the property unless the Board entered an order approving the condemnation; (3) should the Board enter an order approving the condemnation, the trial court should consider the propriety of condemnation pursuant to KRS 416.610; and (4) that the Commissioners' award was a 'denial of just compensation.' "[6]

In response to the Kiplings' motion, the City argued that nothing in KRS 262.850 divested the trial court of its jurisdiction to decide condemnation claims.[7] The City maintained that the only thing the Board was authorized to do under KRS 262.850(16) was to hold a hearing on the

---

4. Following reissuance of the second corrected summons, the Kiplings made another request to the Board for a hearing on July 18, 1998.

5. The Kiplings filed an initial motion to quash, dismiss and exceptions on May 13, 1998. This second motion, which was filed after the Kiplings were served with the corrected summons, was virtually identical to the original motion.

6. The Kiplings alleged that they were not able to make specific arguments pertaining to the Commissioner's award at this time because they had not been served with a copy of the Commissioner's award.

7. The City's responses were filed in answer to the Kiplings' original motion to quash, dismiss, and exceptions. No further responses were filed by the City following the filing of the Kiplings' second motion.

proposed taking. The City further argued that KRS 262.850(16) had no application because it was seeking a permanent easement for underground utility lines as opposed to a permanent taking of land.

In an order entered July 29, 1998, the trial court gave the parties permission to ask the Board to hold a hearing pursuant to KRS 262.850(16), and instructed the parties to provide it with a copy of the Board's final recommendation. In accordance with the trial court's order, the hearing was properly noticed and held on July 28, 1998, at City Hall. Minutes from the meeting showed that several people attended the hearing and spoke for and against the proposed condemnation. On or about August 25, 1998, the Board made the following recommendation:

> On July 25, 1998 ... the [Board] conducted a public hearing on the matter of the [City's] condemnation proceedings to acquire the utility easement across the Kiplings' agricultural district. In comments received during the public hearing, it was evident ... that the need for potable water by citizens in this area was of utmost importance. The [Board's] concern is the location of the proposed sewer and water lines. The [Board] in its role under KRS 262.850, believes its responsibility is to conserve, protect, develop and improve agriculture lands for the production of food and other agricultural products.
>
> In order to protect the integrity and purpose of Kiplings' Agricultural District Program, it is the recommendation of the [Board] that the location of these utility lines should not be located across the Kiplings' Agricultural District.

The Board forwarded the recommendation to the Commission, which reviewed the recommendation at its meeting on September 28, 1998. Prior to the Commission's meeting, counsel for the City and the Kiplings filed written statements of their position with the Board. The City argued that the Board's recommendation was not supported by evidence presented at the hearing because:

> the [utility] lines will be located deep enough so as not to interfere in any manner whatsoever with the use of the property for agricultural purposes, whether for row cropping or for pasture.

Counsel for the City further maintained that the water line would "insure a sure and ample water supply to the Kipling agricultural district," and would "improve agricultural lands for the production of food and other agricultural products." Counsel for the Kiplings argued that there were other locations available for placement of the utility lines, that because the City was responsible for paying for the easements the Kiplings' land was chosen because "it would cost less to obtain that easement, and that future maintenance of the sewer line would cause future interference with crop production." Minutes from the Commission's meeting of September 28, 1998, show that the Commission decided to adopt the Board's recommendation, and it was formally adopted on October 9, 1998. Following receipt of the Board's decision, the City took no formal steps to appeal. The Kiplings filed the Commission's decision and minutes from the meeting of September 28, 1998, with the trial court on October 22, 1998.

On October 25, 1998, the City filed a motion asking the trial court to allow the condemnation proceedings to proceed. In support of its motion, the City once again argued that KRS 262.850(16) did not transfer jurisdiction of condemnation proceedings concerning land located in an agricultural district from the circuit court to local soil and water conservation districts.

In response to the City's motion, the Kiplings argued that the recommendation

of the Commission had become final and was res judicata because the City did not appeal from the Commission's findings. The Kiplings further argued that the statute in question "clearly prohibits and limits the exercise of the City's right to condemn by a conventional taking of agricultural district real estate. Under the Kiplings' argument:

> A Kentucky trial court, when faced with municipalities' attempt [sic] to condemn Agricultural District property, should first defer to the Board and if the Board elects to consider the issues and enter findings, conclusions, and a Final Opinion by the Board. If the Board either fails to set a hearing or rules on the merits of the propriety of the taking in favor of the city, the Court then returns to consider whether the municipality has acted arbitrarily and capriciously and also whether the condemnation is for a public purpose/public use.

The Kiplings also argued that the more specific provisions of KRS 262.850(16) controlled over the more general provisions of KRS 416.570.

In an order entered February 12, 1999, the trial court entered an order granting the City's motion to allow the condemnation action to proceed. In so ruling, the trial court stated:

> First, the Court does not believe KRS 262.850(16) was intended to displace the law of eminent domain as set forth in KRS 416.570 et seq. For several centuries prior to the American Revolution the power of eminent domain existed in the English Parliament. Eminent domain is a power almost inherent in any government. State governments often delegate the power to political subdivisions such as city and county governments.
>
> This Court does not believe that the mere power to hold a public hearing

grants to the local soil and water conservation district board a power either to allow or prevent the condemnation power. For such a power to exist it should be specifically granted.

> Second, even if it was the intent of the legislature to alter the power of eminent domain as suggested by the respondent, the documents attached to the respondents' response is hardly a record that should be binding on this Court. For instance, the recommendation of the Hopkins County Conservation District is a mere conclusion that utility lines should not be located across the Kipiing [sic] Agricultural District. No facts or reasoning are included. In the statement itself there is only the concern of the agricultural district set forth with no consideration given the public interest of the city
>
> . . . .
>
> The Court does not believe the record of the administrative agencies is the kind of record that should be binding on a law court. The binding resolution of a dispute between parties requires a more developed procedure.

After ruling that the condemnation process could proceed, the trial court began to consider the merits of the condemnation case. The Kiplings maintained that there was a distinct possibility that neither the sewer nor the water line project would be funded because the City was not in compliance with the terms of the various grants used to finance the project. Citing *Northern Kentucky Port Authority v. Cornett*, Ky., 625 S.W.2d 104 (1981), as authority, the Kiplings argued that the City had no right to condemn their property because there was no "reasonable assurance that the intended use would come to pass." *Cornett*, 625 S.W.2d at 105, *citing Falkner v. Northern States Power Co.*, 75 Wis.2d 116, 248 N.W.2d 885, 893 (1977). The

Kiplings further contended that in the absence of an assurance that funding was available to undertake the construction of the utility lines, the taking of their property would be arbitrary and capricious. In response to the Kiplings' argument, the City maintained that the Kiplings had failed to present any evidence to show that neither project could be completed or that the City would not ultimately be able to comply with the terms of the respective grants.

The trial court addressed these and other matters in an order entered on July 13, 1999. First, the trial court found that the City had the power to condemn the Kiplings' property pursuant to KRS 74.090 and KRS 76.110. The trial court also found that the City had complied with the condemnation procedures set forth in KRS 416.550–KRS 416.670. In regard to the funding issue, the trial court held:

> This Court believes that the [City] is correct that there has been no evidence presented to show conclusively that there are no reasonable assurances that those projects will not come to pass. There may be some flaws in the plans of the [City]. Every grant may not be completely in place—But this does not mean that the [City] is not proceeding in good faith and that there is a reasonable possibility that the projects will not occur. If the [City] is unable to secure all of the grants, then the question of the easements and condemnation will be moot. The projects would not take place. However, at this time, this Court does not believe that the [City] has done anything to violate the test set forth in [Cornett].

On August 27, 1999, the trial court entered an interlocutory judgment finding that the City had the power to condemn the land for the purpose of a utility easement and that the Commissioner's report complied with KRS 416.580. The trial court ordered the City to "pay to the [Kiplings] or deposit with the Clerk of this Court the sum of $500.00 as the compensation awarded by the Commissioners" and that upon payment of the money the City could take immediate possession of the land. The City paid the money to the Circuit Court Clerk on or about September 2, 1999.

In response to the trial court's order, the Kiplings filed exceptions to the interlocutory judgment on September 8, 1999. From the record, it appears that the Kiplings did not wait for the trial court to rule on their exceptions as they filed a notice of appeal on September 10, 1999.

After the filing of the notice of appeal, there were further proceedings which occurred before the trial court regarding the condemnation of the Kiplings' land. Pursuant to an order entered August 31, 2001, we asked that the record be supplemented to include these proceedings.

On October 20, 1999, the Kiplings filed a motion to set aside the interlocutory judgment pursuant to CR 60.02. The Kiplings maintained that evidence obtained since entry of the interlocutory judgment "conclusively establish that both the City and the City's grant funding sponsors have all conclusively determined that the project will not be funded to include the Kipling Agricultural District nor penetrate the Kipling AD." The Kiplings argued that "consistent with the Court's holding of July 13, 1999, the Issues [sic] before the Court are now 'moot' and the projects 'will not take place,' [sic] thereby conclusively triggering the holdings of [Cornett]." The Kiplings' motion was supported by evidence attached to the motion. In response to the Kiplings' motion, the City concedes that it has abandoned its plan to run a sewer line across the Kiplings' property for the time being, and that the AML

"funded portion of the water line has also been moved from the Kipling property."[8] However, the City declared its intent "to proceed with its own funding of an extension of its present [water] system across the Kipling property[.]" The city stated that extension of the water system was necessary to replace an inadequate 2–inch main serving 15–20 houses in the immediate area with a 4–inch main. According to the City, the 4″ main would expand service to additional houses and new construction, and would connect into the AML funded project and thus improve its service. Furthermore, because of potential problems with the relocation of the AML funded portion of the water line, location of the 4–inch main across the Kiplings' property would allow continuous service if the rerouted AML line were to be disconnected at a later date. Based on these issues, the City asked the trial court to "find that the use of the easement across the Kiplings [sic] property for a water line continues to serve and fulfill a public need and necessity." In response to the City's argument, the Kiplings stated that the width of the easement should be reduced to 10 feet due to removal of the sewer line project. The Kiplings further maintained that the City was unable to fund extension of the water line on its own without any grants, and that the water easement should be set aside due to this lack of funding. On April 28, 2000, the trial court entered an order granting the Kiplings' CR 60.02 motion "relative to the use of any Easement ... granted to the City ... over or within the Kipling AD for a sewer easement, such use being hereby voided and vacated," and setting a hearing for the remaining issues.

During the hearing, evidence was presented to show that construction of the water line across the Kiplings' property had already commenced despite the fact that the Kiplings had appealed from the interlocutory judgment. On September 21, 2000, the trial court entered an agreed order modifying the interlocutory judgment of August 22, 1999, to provide for a 10–foot easement as opposed to a 20–foot easement. This is the status of the matter as it currently stands before this Court.

We acknowledge that we asked the parties to provide supplemental briefing on two issues: (1) whether the fact that the water line has been partially or completely installed renders this appeal moot; and (2) if the appeal is not moot, what would be the appropriate remedy for the Kiplings. We will address these issues before resolving the merits of the Kiplings' appeal.

Our purpose in inquiring as to whether the partial construction of the water line rendered the appeal moot was spurred by construction of the water line beginning on or about March 23, 2000, and entry of the agreed order of September 27, 2000. We wanted to establish that by participating in the agreed order to narrow the easement from 20 feet to 10 feet the Kiplings were not somehow acquiescing to the construction of the water line. We are now satisfied that there was no such intent on behalf of the Kiplings in signing the agreed order.

Both of the parties agree in their supplemental briefs that the construction of the water line across the Kiplings' property during the pendency of the appeal does not render the issues raised in the appeal moot. After a review of the authorities cited in the supplemental briefs, we agree with the position of the parties in regard to this issue. Under KRS 416.610(2)(c), once the interlocutory judgment has been entered in favor of the condemnor, it is then authorized "to take possession of the property for the purposes ... set forth in the

---

8.  The AML funded portion of the water line has been moved to another location.

petition upon payment to the owner or to the clerk of the court the amount of the compensation awarded by the commissioners[.]" The condemnee's right to appeal from the entry of the interlocutory judgment was recognized in *Ratliff v. Fiscal Court of Caldwell County, Ky.*, Ky., 617 S.W.2d 36 (1981):

> While the word "interlocutory" normally implies a non-appealable order, such an order ... can be appealed if a matter is finally litigated by the judgment, or if it operates to divest some right in such manner as to put it out of the power of the court to place the parties in their original condition. [Citations omitted]. We believe that if the right of immediate possession ... is exercised, in many instances, even if an appellate court later reverses the trial court's determination of the condemnor's right to take, that the condemnee cannot be returned to his same position.... Moreover, if the mandated appeal is made after the taking [and after entry of a final judgment on the issue of damages stemming from the condemnation], the *condemnor* could easily suffer by a condemnee's action in "laying under the log" and allowing excessive damages to accrue, prior to appeal.

*Ratliff,* 617 S.W.2d at 39.

As to the question of what remedy the Kiplings would be entitled to should we reverse the orders of the trial court, we agree with the parties that this issue would be taken up before the trial court on remand.

## I. DID THE TRIAL COURT ERR IN HOLDING THAT AGRICULTURAL DISTRICTS ARE NOT CONDITIONALLY PROTECTED FROM CONDEMNATION?

■ The Kiplings maintain that by providing for the creation of agricultural districts under KRS 262.850, the legislature intended for land in an agricultural district to be "preserved and fully immune from municipal annexation and conditionally immune from condemnation for a competing municipal purpose." They contend that once an agricultural district has been created, the land within it is no longer mere private property, but land which has been set aside for a "public purpose," i.e., the conservation of agricultural land pursuant to KRS 262.850(2), and that under the doctrine of prior public use, "land devoted to a public use may not be taken for another public use under the power of eminent domain." *United States v. 929.70 Acres of Land,* 205 F.Supp. 456, 457 (S.D. 1962). We disagree.

Under KRS 262.850(2), the legislature stated that it is the policy of the State to conserve and protect agricultural land and to encourage development and improvement of such land. To that end, the remaining portions of KRS 262.850 provide a way for owners of agricultural land to have their land declared to be an agricultural district. However, there is nothing in KRS 262.850 which provides that once an agricultural district is created, the land within it has somehow been set aside for a public purpose.

■ There is little doubt that the public does benefit when agricultural districts are created because they contribute to "the production of food and other agricultural products." KRS 262.850(2). However, for purposes of condemnation and eminent domain, the fact that the public receives some sort of benefit from a certain use of land does not mean that the land is being used for a public purpose. *See City of Owensboro v. McCormick,* Ky., 581 S.W.2d 3 (1979) (holding that public benefit is not the equivalent of public use).

The Kiplings chose to have their property declared an agricultural district. In

doing so, they did not hold their land open to the public for a public use, nor did they turn it over to the state for a public use. Thus, the doctrine of prior public use does not apply.

▪ We also do not agree with the Kiplings' argument that agricultural districts are conditionally protected from condemnation by KRS 262.850(16). Contrary to the Kiplings' assertions, there is nothing in the language of KRS 262.850(16) which delegates responsibility for "the examination of the priority and necessity for a municipality's condemnation of land within an [agricultural] district" to the Board. Under the rules of statutory construction, we are to evaluate a statute based on what it says as opposed to what it might say. *Estes v. Commonwealth,* Ky., 952 S.W.2d 701, 703 (1997). "It is our responsibility to ascertain the intention of the legislature from the words used in enacting the statute rather than surmising what may have been intended but was not expressed." *Flying J Travel Plaza v. Commonwealth, Transportation Cabinet Department of Highways,* Ky., 928 S.W.2d 344, 347 (1996). KRS 262.850(16) says nothing about making the power of a city to condemn property located in an agricultural district conditional upon approval from a local board of supervisors, nor does it divest the circuit court of the jurisdiction to hear condemnation proceedings which was granted to it under KRS 416.570. "[W]hat is not found in [a] statute is a matter for the legislature to supply and not the courts." *Day v. Day,* Ky., 937 S.W.2d 717, 719 (1997).

The only thing KRS 262.850(16) provides is that once the owner of property located in an agricultural district receives a summons of condemnation proceedings, he may ask the local conservation district board of supervisors "to hold a public hearing on the proposed taking of land." There is nothing in the statute which au-thorizes the local board of supervisors to do anything other than hold a public hearing, let alone to issue some sort of binding resolution as to whether the condemnation of the property is proper. In this case, the Kiplings asked for and received a public hearing. That is all they were entitled to under KRS 262.850(16).

**II. DID THE TRIAL COURT ERR IN HOLDING THAT THE CONDEMNATION PROVISIONS OF KRS CHAPTER 416 AND KRS 82.082(1) WERE NOT PREEMPTED BY KRS 262.850(16)?**

▪ The Kiplings maintain that KRS 82.082(1) and the condemnation provisions of KRS Chapter 416 are general statutes which are preempted by the more specific provisions of KRS 262.850(16). We agree with the Kiplings that "where two statutes concern the same or similar subject matter, the specific shall prevail over the general." *Withers v. University of Kentucky,* Ky., 939 S.W.2d 340, 345 (1997). But we do not agree that the condemnation procedures set forth in Chapter 416 are preempted by KRS 262.850(16).

First, we do not believe that the statutes in question cover "the same or similar subject matter." The provisions contained in Chapter 416, specifically KRS 416.540, 416.570, 416.580, 416.590, 416.600, 416.610, and 416.620 set forth the procedures to be followed in the condemnation process. In comparison, KRS 262.850(16) only provides that the local soil and water conservation district board of supervisors is to hold a hearing upon the request of a property owner who has received a summons seeking to condemn land located in an agricultural district.

Even if we were to find that the statutes covered the same subject matter, we are not convinced that the provisions contained in KRS Chapter 416 are merely general and that KRS 262.850(16) is more specific.

KRS 416.540 contains definitions to be used in interpretation of the Eminent Domain Act of Kentucky. KRS 416.570 provides that a condemnation procedure is initiated by filing a verified petition of condemnation with the circuit court of the county in which the property is located and dictates what the petition must contain. KRS 416.580 provides for the appointment of commissioners to determine the award to be paid to the property owner and sets forth how the commissioners are to reach their determination and what their report is to contain. KRS 416.590 covers the issuance of the summons to the property owner while KRS 416.600 sets forth what is to be contained in the property owner's answer to the petition. KRS 416.610 sets forth provisions for the trial of the petition for condemnation. Finally, KRS 416.620 provides for the filing and resolution of exceptions to the interlocutory judgment, entry of the final judgment, and the appellate process.

In comparison to the foregoing provisions, KRS 262.850(16) merely authorizes the local soil and water conservation district board of supervisors to hold a hearing. It is silent as to how the hearing is to be held, what form any order the local board issues is to take or what it is to contain, whether or how exceptions can be filed and resolved, and how appeals are to be taken. Given the details of the condemnation process set forth in KRS Chapter 416, it cannot be seriously argued that the provisions of KRS 262.850 are more specific.

## III. DID THE TRIAL COURT ERR IN REFUSING TO FIND THAT THE CITY WAS BOUND BY THE DECISION OF THE BOARD AND THE COMMISSION?

The Kiplings maintain that the City was bound by the decision of the Board and the Commission for two reasons: (1) the City did not appeal from the Commission's decision of October 9, 1998; and (2) the doctrines of law of the case and res judicata preclude further consideration of the issues by the trial court. The Kiplings argue that although KRS 262.850(16) does not define "hearing," the procedure before the Board was a "hearing" as defined by KRS 13B.010(2) and that the City's failure to avail itself of the appeal process set forth in KRS 13B.140 preclude it from raising the same issues before the trial court. We disagree.

KRS Chapter 13B deals with administrative hearings, which are defined as "any type of formal adjudicatory proceedings conducted by an agency as required or permitted by statute or regulation to adjudicate the legal rights, duties, privileges, or immunities of a named person." KRS 13B.010(2). The conduct of the hearing and the taking of evidence is outlined in KRS 13B.080–13B.090, the issuance of the final order is covered in KRS 13B.120, and KRS 13B.140 deals with judicial review of the final order. However, KRS 13B.020(2)(d) makes it clear that KRS Chapter 13B does not apply to "[a]ny other public hearing conducted by an administrative agency which is non-adjudicatory in nature and the primary purpose of which is to seek public input on public policy making."

We do not believe that the hearing before the Board envisioned by KRS 262.850(16) rises to the level of an adjudicatory hearing whose outcome would be binding. Rather, we believe that hearing is to be nonadjudicatory and its purpose is "to seek public input" on the question of whether land within an agricultural district should be condemned. Our finding is supported by the language of the statute itself, as it only requires a "public hearing on the proposed taking of land." The statute does not require the Board to issue

an order, and furthermore the statute does not direct the Commission to become involved at all in the hearing process.

Even if we were to find that the public hearing in this case was covered by KRS Chapter 13B, the record on appeal shows that it was not conducted in compliance with that Chapter. There was no hearing officer. None of the people who spoke at the hearing testified under oath or affirmation as required by KRS 13B.090(2). Instead of issuing a final order as required by KRS 13B.120, the Board merely made a recommendation on August 25, 1998, which was forwarded to the Commission for further review. As no final order as contemplated by KRS 13B.120 was ever issued, there was nothing to appeal from. Based on the foregoing, we find that the City was not required to appeal from the recommendation of either the Board or the Commission, and that the recommendation itself does not preclude the City from maintaining its condemnation proceeding before the trial court.

## IV. WAS THE CITY'S DECISION TO RUN THE WATER LINE ACROSS THE KIPLING AGRICULTURAL DISTRICT ARBITRARY AND CAPRICIOUS?

 The Kiplings argue that the City's decision to place the water line within the agricultural district is arbitrary and capricious because other alternative routes exist. The Kiplings concede in their brief on appeal that the trial court did not rule on this issue, but argue that the failure of the trial court to rule on this issue allows us to render a decision. We disagree.

The record does not show that the Kiplings asked the trial court to issue a ruling on this issue. Under CR 52.04:

A final judgment shall not be reversed or remanded because of the failure of the trial court to make a finding of fact on an issue essential to the judgment unless such failure is brought to the attention of the trial court by a written request for a finding on that issue or by a motion pursuant to Rule 52.02.

Thus, we are not permitted to render a ruling on this issue.

Having considered the parties' arguments on appeal, the orders of the Hopkins Circuit Court are affirmed.

ALL CONCUR.