ANN WALSH BRADLEY, J.
¶ 123. {dissenting). The majority has transformed what should be a case of minor statewide impact involving only a small amount of money into a case with significant ramifications and costly consequences for ratepayers and taxpayers who end up paying the bills.
¶ 124. The ramifications will affect how all condemnors throughout the state proceed with the taking of property for projects, large and small.[1]
¶ 125. Because the majority rewrites and broadens the statutory definition of an uneconomic remnant, condemnors may now be required to take an increased *292 amount of property that they do not want or need for their projects. Increased costs to ratepayers and taxpayers will accompany these unnecessary takings because now condemnors can be required to pay for the entire property, together with relocation benefits, rather than paying for the taking of only an easement.
¶ 126. In concluding that the right-to-take proceeding is the only way to bring an uneconomic remnant claim, the majority rewrites another statute. Rather than following the clear words of the right-to-take statute, the majority creates a process with concurrent dual proceedings which has the potential for conflicting valuations and procedural quagmires. The majority's process of dual proceedings contravenes the legislative purpose of the condemnation statutory scheme, which is to promote efficient and cost-effective condemnation procedures.
¶ 127. Likewise, because the majority rewrites what it initially acknowledges as the clear language of a third statute, the litigation expense statute, it awards out-of-proportion litigation expenses of $211,261.64 for a case involving only a few thousand dollars difference in value.
¶ 128. Our task when interpreting statutes is to discern the statute's meaning, which we presume is expressed in the language of the legislature. Richards v. Badger Mut. Ins. Co., 2008 WI 52, ¶ 20, 309 Wis. 2d 541, 749 N.W.2d 581. In applying the words of the statutes written by the legislature, I conclude that a valuation proceeding under Wis. Stat. § 32.06(7) is the proper proceeding to bring an uneconomic remnant claim. Furthermore, I determine that the Wallers' property is not an uneconomic remnant as it is defined by Wis. Stat. § 32.06(3m) and that the Wallers are not entitled to *293 litigation expenses or relocation benefits. Accordingly, I respectfully dissent.
I
A. The majority rewrites Wis. Stat. § 32.06(3m), the uneconomic remnant statute.
¶ 129. The majority rewrites the statutory definition of an uneconomic remnant. It describes the remnant here as "the Wallers' property," leaving the impression that the remnant is the entire property rather than a remaining piece of the property. Majority op., ¶ 7.
¶ 130. Basing its analysis on a percentage formula (57%, 88%, and 76%), the majority opines that the percentage losses in value illustrate "substantial economic impairment" to the property. Id., ¶ 95. In addition to considering the percentage losses to the property's value, it states that the Waller property is an uneconomic remnant because the easements "diminished the desirability, practicality, and value of the Wallers' property." Id., ¶ 7.
¶ 131. Such an analysis rewrites the uneconomic remnant statute. The text of Wis. Stat. § 32.06(3m), which sets forth a definition of an uneconomic remnant, provides in relevant part:
(3m) Definition. In this section, "uneconomic remnant" means the property remaining after a partial taking of property, if the property remaining is of such size, shape or condition as to be of little value or of substantially impaired economic viability.
¶ 132. The majority rewrites Wis. Stat. § 32.06(3m) in two ways. First, it appears to rewrite the statutory phrase "property remaining" to mean an en *294 tire property. Second, it rewrites the statutory phrase "substantially impaired economic viability" to mean "diminished desirability, practicality, and value."
¶ 133. In essence, to fit the facts of this case, the majority rewrites Wis. Stat. § 32.06(3m) as follows:
(3m) Definition. In this section, "uneconomic remnant" means the entire property remaining after a partial size, shape or condition as to be of little value or of substantially impaired economic viability diminished desirability, practicality, and value. if the property remaining is of such
(additions are in bold, deletions have been struck.)
¶ 134. The majority's revision not only changes the legislature's explicit statutory language defining a remnant, but it also flies in the face of common sense — the entire property cannot constitute only a remaining part of the property. Throughout its opinion, the majority describes the relevant remnant in this case as "the Wallers' property." See majority op., ¶¶ 7, 102, 103, 119. If the majority is indeed defining an uneconomic remnant as the entire property, it makes no sense because a remnant necessarily means something that is remaining or left over.
¶ 135. The common and ordinary meaning of the word "remnant" is "[sjomething left over; a remainder." The American Heritage Dictionary, 1527 (3d ed. 1992). Likewise, the common and ordinary meaning of the statutory word "remaining" contemplates that some property will be "left after the removal, loss, passage, or destruction of others." Id. at 1525. The "remnant" or the "property remaining" cannot mean the whole Waller property — there nothing that is "left over" because the entire property is still intact.
*295 ¶ 136. If the remnant were the entire property, condemnors would be put in the absurd position of having to buy entire properties when the taking leaves the property wholly intact and retaining an economic viability. It substantially inflates the scope of takings required for projects where only easements are necessary, such as the installation of power lines, water or gas pipelines, and the like. In setting forth a definition of an uneconomic remnant, the legislature cannot have intended that a utility company would be forced to buy a whole property in order to install power lines on otherwise existing highway and utility easements.
¶ 137. Arguably the majority embraces its strained "whole=left over part" analysis because under the facts of this case it also makes no sense that the remnant is the remaining part of the property which is unencumbered by easements. The following illustration, which is not to scale, depicts the previously existing highway and utility easements together with the ATC easements superimposed on top of them:
[[Image here]]
*296 The legislature likewise cannot have envisioned that public utilities would be forced to take fee simple title to the interior part of property as an "uneconomic remnant" while leaving the property owner fee simple title subject to easements in the borders of the property.[2] It would be absurd.
¶ 138. The second way in which the majority rewrites the statutory definition of the remnant also leads to absurd results. The statute sets forth the "size, shape and condition" test to be applied when determining "substantially impaired economic viability." Wis. Stat. § 32.06(3m). Instead of focusing on the statutory test, the majority makes up its own. It interprets "substantially impaired economic viability" to mean "diminished ... desirability, practicality, and value." Majority op., ¶ 7. The majority's emphasis on desirability, practicality, and value causes it to employ a percentage formula in determining whether the Waller property is an uneconomic remnant that at first appears compelling, but ultimately the use of a percentage formula can lead to absurd results. Majority op., ¶ 85.
¶ 139. The absurdity is illustrated in the taking of an easement on a highly valued piece of property. Take, for example, a $6 million parcel of land:
*297 ¶ 140. If the value of the property after the partial taking decreases by 57%, as Rolling's appraisal indicated, then the value of the remaining property is $2,580,000.
¶ 141. If the jurisdictional offer's estimation of the decrease in value is used and the $6 million parcel loses 76% of its value, the remaining property is worth $1,440,000.
¶ 142. If the Group One appraisal's estimation of the decrease in value is used and the $6 million parcel loses 88% of its value, the remaining property is worth $1,320,000.
¶ 143. Few would argue that a property with an after-taking value of $2,580,000, $1,440,000, or $1,320,000 is an uneconomic remnant of "substantially impaired economic viability," except perhaps in the extreme circumstance where there are other compelling factors present in the facts. Does the majority really mean to employ an analysis that could declare a multimillion dollar property an uneconomic remnant?
¶ 144. Rather than rewrite Wis. Stat. § 32.06(3m) to fit the Wallers' situation, the majority should stick to applying the words chosen by the legislature. Such a practice would avoid the absurd results described above.
B. The majority rewrites Wis. Stat. § 32.06(5), the right-to-take statute.
¶ 145. The majority tackles the issue of what condemnation proceeding should be used to raise an uneconomic remnant claim — a valuation proceeding[3] *298 under Wis. Stat. § 32.06(7)[4] or a right-to-take proceeding under Wis. Stat. § 32.06(5). Majority op., ¶ 68. Citing to Wis. Stat. § 32.06(5), the right-to-take statute, it concludes that an uneconomic remnant claim can be maintained only in a right-to-take proceeding. Id., ¶ 92.
¶ 146. In reaching this conclusion, however, the majority rewrites the right-to-take statute. As the legislature wrote the statute, it provides, in relevant part:
(5) Court action to contest right of condemnation. When an owner desires to contest the right of the condemnor to condemn the property described in the jurisdictional offer for any reason other than that the amount of compensation offered is inadequate, such owner may ... commence an action in the circuit court of the county wherein the property is located, naming the condemnor as defendant. Such action shall be the only manner in which any issue other than the amount of just compensation or other than proceedings to perfect title under ss. 32.11 and 32.12 may be raised *299 pertaining to the condemnation of the property described in the jurisdictional offer.
Wis. Stat. § 32.06(5) (emphasis supplied).
¶ 147. The Wallers are not contesting the right of the condemnor to condemn — quite the opposite. They want the condmenor to condemn even more property. In an effort to shoehorn the facts of this case into the right-to-take proceeding, the majority rewrites the statute by ignoring part of the statutory language.
¶ 148. The majority erases the portion of Wis. Stat. § 32.06(5) stating that the proceeding is to be maintained when "an owner desires to contest the right of the condemnor to condemn the property described in the jurisdictional offer . . . ." Wis. Stat. § 32.06(5). Despite that clear statement of purpose in the statute, the majority directs future litigants like the Wallers, who do not in any way contest the condemnor's right to take the property described in the jurisdictional offer, to bring uneconomic remnant claims under Wis. Stat. § 32.06(3m) in a right-to-take proceeding.[5]
¶ 149. All of the legislature's words must be accorded meaning, and here the legislature has stated that a right-to-take proceeding is to be maintained when an owner contests the right of the condemnor to take the property described in the jurisdictional offer. However, the majority appears to delete that language from Wis. Stat. § 32.06(5) in characterizing the right-to-take proceeding as a catchall proceeding for uneconomic remnant claims.
*300 ¶ 150. Additionally, Wis. Stat. § 32.06(5) is rewritten when the majority leaves out other statutory words from its analysis. It emphasizes "any issue," but the statute states in full "any issue other than the amount of just compensation . . . ." By emphasizing "any issue," the majority implicitly holds that an uneconomic remnant claim is not really one of just compensation.
¶ 151. However, just compensation is at the heart of the uneconomic remnant claim here. The owners want more money.
¶ 152. Misinterpreting an uneconomic remnant claim as an issue of the right to take rather than an issue of how much compensation a property owner should receive creates a procedural quagmire. Because the majority contemplates that a right-to-take case proceeds concurrently with a valuation proceeding, see majority op., ¶¶ 92, what happens when the answers reached in each proceeding conflict with each other? Both proceedings require a fact finder to determine the before and after value of the property at issue. When they are in conflict, which valuation trumps the other?
¶ 153. If the valuation in the right-to-take proceeding trumps the valuation in the valuation proceeding, how does that affect the statutory right to a jury trial in the valuation proceeding? Wisconsin Stat. § 32.06(10) expressly sets forth a statutory right to a jury in a valuation proceeding. It states that a valuation proceeding on appeal to the circuit court "shall be tried by a jury unless waived by both plaintiff and defendant." Id. Is such a statutory right now to be subsumed in favor a judge's determination of value in a right-to-take proceeding?
¶ 154. Here, the court of appeals held that the jury's verdict in the valuation proceeding must be vacated if the circuit court determined — as it did — that the *301 taking resulted in an uneconomic remnant. Waller v. American Transmission Co., LLC, 2011 WI App 91, ¶ 17, 334 Wis. 2d 740, 799 N.W.2d 487. Because there is a statutory right to a trial by jury in a valuation proceeding and the jury's verdict is now vacated, does that mean that the valuation proceeding must be retried?
¶ 155. Is the circuit court's determination on the issue of value in the right-to-take proceeding subject to a claim of issue preclusion in the valuation proceeding? If so, is the denial of the statutory right to a jury trial implicated?
¶ 156. The condemnation statutory scheme strives for proceedings which are both efficient and cost-effective. Pulvermacher Enterprises, Inc. v. Wisconsin DOT, 166 Wis. 2d 234, 241, 479 N.W.2d 217 (Ct. App. 1991). The majority's conclusion that an uneconomic remnant claim can be brought only in a right-to-take proceeding is contrary to those purposes and potentially creates the procedural quagmire described above.
¶ 157. This case provides a textbook example of the inefficiencies likely to result from the majority's procedures. Here, the same evidence is so essential to both the question of just compensation and the uneconomic remnant determination that the circuit court incorporated the record and the jury's verdict setting forth before and after values from the valuation proceeding into the right-to-take case. See majority op., ¶ 36. After the court of appeals reversed the circuit court a second time, concluding that a hearing was necessary to determine whether an uneconomic remnant exists, the same witnesses who testified in the valuation trial were called. They offered essentially the same testimony. See majority op., ¶ 41.
¶ 158. Condemnation proceedings are designed not only to provide for an efficient resolution to the *302 question of compensation, but also to provide a cost-effective method of taking property. Pulvermacher Enterprises, Inc., 166 Wis. 2d at 241. In Falkner v. Northern States Power Co., 75 Wis. 2d 116, 248 N.W.2d 885 (1977), even as this court recognized that a right-to-take proceeding is independent from a valuation proceeding, it also observed that" [duplication of effort and expense may result if separate trials are held." Falkner, 75 Wis. 2d at 135 n.9. The Falkner court therefore recognized that the condemnation statutes are designed to avoid unnecessary expense incurred by concurrent proceedings.
¶ 159. In an amicus brief, the Wisconsin Utilities Association provides examples of the added expense that will likely arise due to the condemnation procedures adopted by the majority. It advances that the added expense will ultimately appear in Wisconsin residents' utility bills:
For example, Wisconsin utilities . . . depend on efficient condemnation procedures to allow them to quickly construct new power lines, gas pipes, and water pipes to meet Wisconsin's growing utility needs... . The financial expenses associated with the eminent domain process [] directly impact[s] Wisconsin residents, as the costs of doing business as a utility are largely passed on to customers through rates.
In rewriting Wis. Stat. § 32.06(5), the majority has left in its wake inefficient condemnation proceedings that are more expensive to maintain. The costs of the majority's procedures will be passed on to rate-payers and taxpayers alike.[6]
*303 C. The majority rewrites Wis. Stat. § 32.28(2)(b), the litigation expenses statute.
¶ 160. The litigation expenses awarded by the circuit court total $211,261.74. Majority op., ¶ 44. In its discussion of litigation expenses, the majority does not even mention the amount awarded by the circuit court. It nevertheless, without analysis of the amount, affirms the entire award as reasonable. Id., ¶¶ 106-110.
¶ 161. The error of the majority's sub silencio reasonableness determination is compounded because it has to rewrite a statute in order to affirm this award of out-of-proportion litigation expenses. Wisconsin Stat. § 32.28(3)(b), the litigation expenses statute, provides in relevant part:
(3) In lieu of costs under ch. 814, litigation expenses shall be awarded to the condemnee if:
(b) The court determines that the condemnor does not have the right to condemn part or all of the property-described in the jurisdictional offer or there is no necessity for its taking....
¶ 162. The majority initially accepts point-blank that the "plain language" of the statute does not allow the majority to award litigation expenses here. Majority op., ¶ 107. The plain language allows litigation expenses only if "the condemnor does not have the right to condemn part or all of the property described in the juris *304 (fictional offer." Wis. Stat. § 32.28(3)(b). Nevertheless, the majority seemingly ignores the plain language and rewrites the statute by awarding litigation expenses in a case where all agree that ATC has the right to condemn part or all of the property described in the jurisdictional offer. Id.
¶ 163. An award of litigation expenses is ordinarily authorized by statute and must fit within the relevant statutory grant of authority to justify an award in a given case. Shifting litigation expenses under Chapter 32 is no different — it "is a matter of policy to be determined by the legislature ...." Wieczorek v. City of Franklin, 82 Wis. 2d 19, 23, 260 N.W.2d 650 (1978). By applying Wis. Stat. § 32.28(3)(b) to these facts, the majority is rewriting the words of the statute and granting an award of litigation expenses that the legislature did not authorize.
¶ 164. Ultimately, the ramifications of rewriting Wis. Stat. § 32.28(3)(b) to fit this fact pattern will be felt by the rate-paying public. It is not really ATC that is on the hook for paying the Wallers' disproportionately large litigation expenses. Rather, it is those Wisconsin residents who use electricity that will pay the $211,261.74 bill.
¶ 165. The amounts in dispute in this case are dwarfed by the Wallers' litigation expenses. Here, ATC offered to purchase the easements for $99,500 in a consensual sale. That offer exceeded the awards of both the compensation commission, which awarded $90,000 for the easements, and the jury, which awarded $94,000 for the easements. In the alternative, ATC conditionally offered to buy the Wallers' entire property for $132,000 —the same valuation that the jury ultimately proffered for the Waller property.
¶ 166. The Wallers rejected ATC's offers. Instead, they took ATC to court. They chose to litigate until the *305 case had seen three circuit judges, the condemnation commission, two panels at the court of appeals, and now the Wisconsin Supreme Court.
¶ 167. In the end, a jury awarded the Wallers $5,500 less for the easements than what ATC offered to pay in a consensual sale.
¶ 168. The Wallers' attorneys have without question vigorously and diligently advanced their clients' interests. However, a litigation expenses award of $211,261.74 in a matter where the just compensation award was less than what was initially offered in a consensual sale and where it is undisputed that the condemnor has a right to take the easements at issue is wholly out of proportion to the scale of the dispute.
¶ 169. The law requires that an award of litigation expenses must be reasonable and necessary. Standard Theatres, Inc. v. Wisconsin DOT, 118 Wis. 2d 730, 741, 349 N.W.2d 661 (1984). In evaluating the reasonableness of proposed litigation expenses, this court has in past cases utilized SCR 20:1.5 as a useful guide. Kolupar v. Wilde Pontiac Cadillac, Inc., 2004 WI 112, ¶ 24, 275 Wis. 2d 1, 683 N.W.2d 58. One factor to consider under SCR 20:1.5 is "the amount involved and the results obtained." Such an out-of-proportion award is not reasonable under these circumstances, given the "amount involved" and the "results obtained."
¶ 170. By affirming an award of $211,261.74 in litigation expenses here, the majority is sending the wrong message. Litigants may have little incentive to avoid dragging out small disputes about uneconomic remnants, hoping that future courts will likewise shoehorn their circumstance into the words of the statute and award out-of-proportion litigation expenses.
*306 II
¶ 171. Our task when interpreting statutes is to discern the statute's meaning, which we presume is expressed in the language of the legislature. Richards, 309 Wis. 2d 541, ¶ 20. For the reasons set forth above, I conclude that the right-to-take procedure is ill-fitted for an uneconomic remnant determination. It would require rewriting of the statute and results in concurrent, costly, and potentially conflicting procedures.
¶ 172. The uneconomic remnant determination is about compensation, not the right to condemn. That is especially evident in this case. The Wallers do not challenge ATC's right to condemn. Rather, they seek additional compensation based on the nature of ATC's taking.
¶ 173. In applying the words of the statutes as written by the legislature, I conclude that Wis. Stat. § 32.06(7) sets forth the correct procedure because it focuses on valuation and compensation. Wisconsin Stat. § 32.06(7) requires that if the condemnor is "entitled to condemn the property or any portion of it, the judge immediately shall assign the matter to the chairperson of the county condemnation commissioners for hearing under s. 32.08." Such a proceeding may be commenced in the circuit court by verified petition "for proceedings to determine the necessity of taking, where such determination is required, and the amount of iust compensation."[7] Id.
*307 ¶ 174. Thus, even if an uneconomic remnant claim implicates issues related to the necessity of the taking, Wis. Stat. § 32.06(7) allows for the resolution of those uneconomic remnant claims. Under the statute, the circuit court is expressly empowered to determine the necessity of the taking before referring the matter to the condemnation commission. Wis. Stat. § 32.06(7); see also Wis. Stat. § 32.07(3) (allowing the necessity of a taking to be determined by the court). A "proceeding to determine the necessity of taking" naturally encompasses uneconomic remnant arguments that implicate the scope of a taking.
¶ 175. The legislative purpose of the condemnation statutory scheme supports my conclusion. The purpose "is to provide an efficient, final resolution to the compensation question." Pulvermacher Enterprises, 166 Wis. 2d at 241.
¶ 176. Bringing an uneconomic remnant claim in a valuation proceeding avoids the procedural quagmire identified above. It will encourage questions such as the ones presented here, where the Wallers do not dispute the taking but instead seek additional compensation, to be resolved quickly and efficiently so that just compensation may be addressed with a measure of finality.
¶ 177. Having determined that a valuation proceeding is the correct way to raise an uneconomic remnant claim, I turn to address whether the Wallers' remaining property after the taking is an uneconomic remnant. Wisconsin Stat. § 32.06(3m) states that a parcel is an uneconomic remnant under two circumstances —when the remnant is of such size, shape or condition so as to be of "little value" or is of "substantially impaired economic viability."
*308 ¶ 178. No one argues on review that the Waller property is of "little value," and because the Waller property has $38,000 in value after the taking, such an argument would be difficult to successfully advance under these facts. Ultimately, the real question is whether the Wallers' remaining property is of such "size, shape or condition" so as to be of "substantially impaired economic viability." Wis. Stat. § 32.06(3m).
¶ 179. Here, the "size, shape or condition" of the Waller property before the taking indicates that it was a property subject to substantial restrictions. It was a small triangle of land with a residence subject to substantial easements for power lines and setback restrictions, which is situated next to an industrial park and a major interstate highway.
¶ 180. ATC proposed to take only easements, leaving the Wallers with a fee simple title to the entire parcel. The easements expand upon already-existing easements, and most of the new easements are within an area already subject to setback restrictions.
¶ 181. Given the nature of the taking in this case and the $38,000 in value left over after the taking, the Wallers have failed to establish that the size, shape or condition of the property remaining after the taking is of "substantially impaired economic viability." Wis. Stat. § 32.06(3m). Under these circumstances, I conclude that after the partial taking, there is no uneconomic remnant.
¶ 182. Because I determine that there is no uneconomic remnant in this case, I further conclude that an award of litigation expenses and relocation benefits is not justified here. With regard to litigation expenses, the plain text of Wis. Stat. § 32.28(3) (b) allows an award only when the "condemnor does not have the right to condemn part or all of the property described in the *309 jurisdictional offer or there is no necessity for its taking." That circumstance is not present in this case.
¶ 183. Likewise, relocation benefits are available only if the Wallers meet the statutory definition of a "displaced person" under Wis. Stat. § 32.19(2)(e).[8] That statute requires the Wallers to show that they moved "as a direct result of a written notice of intent to acquire or the acquisition of the real property . . . subsequent to the issuance of a jurisdictional offer." See also Wis. Admin. Code § Adm. 92.01(14) (further defining "displaced person"); City of Milwaukee v. Roadster LLC, 2003 WI App 131, ¶¶ 13, 18, 265 Wis. 2d 518, 666 N.W.2d 524 (a lessee was a "displaced person" when it was "forced" to give up its leasehold interest and "forced" to relocate); C. Coakley Relocation Systems, Inc. *310 v. City of Milwaukee, 2008 WI 68 ¶ 19, 310 Wis. 2d 456, 750 N.W.2d 900 (describing the language in Wis. Stat. § 32.19(2)(e) as applying to a "person displaced by a condemnation").
¶ 184. The Wallers listed their house for sale in February 2005, one year before they learned of ATC's transmission-line project. Additionally, they lived in their residence for about one year after the upgraded transmission line was installed. Ultimately, I conclude that they do not satisfy the statutory definition of a "displaced person" under these circumstances because they have failed to establish that they moved as a "direct result" of a "written notice of intent to acquire," an "acquisition," or a "jurisdictional offer." Wis. Stat. § 32.19(2)(e).
¶ 185. Accordingly, I respectfully dissent.
¶ 186. I am authorized to state that Chief Justice Shirley S. Abrahamson joins this dissent.

 The north side of the triangle is abutted by Mound Road. It was previously subject to a 20-foot easement and a 25-foot highway setback. ATC's proposed easement expanded the encumbered area by 25 feet, and would create a 45-foot wide strip of land along Mound Road.
The east side of the triangle abuts Interstate 43 and was previously subject to a 50-foot highway setback. ATC's proposed easement would create a 45-foot wide strip of encumbered property within the existing setback area.
A smaller triangle of land remains unencumbered by easements or setback restrictions after the partial taking. The residence is located on the smaller triangle.

 The majority refers to the proceeding set forth in Wis. Stat. § 32.06(7) in various ways. At times it calls the proceeding a "valuation proceeding." Majority op., ¶¶ 70, 92. Other times, it calls the proceeding a "condemnation hearing on valuation." *298 Id., ¶ 90. In yet other places, it refers to the proceeding as a "just compensation proceeding." Id., ¶ 67. This opinion refers to such a proceeding as a "valuation proceeding."

 Wisconsin Stat. § 32.06(7) states as follows, in relevant part:
(7) Petition for condemnation proceedings. If the jurisdictional offer is not accepted within the periods limited in sub. (6) or the owner fails to consummate an acceptance as provided in sub. (6), the condemnor may present a verified petition to the circuit court for the county in which the property to be taken is located, for proceedings to determine the necessity of taking, where such determination is required, and the amount of just compensation. ... If the petitioner is entitled to condemn the property or any portion of it, the judge immediately shall assign the matter to the chairperson of the county condemnation commissioners for hearing under s. 32.08. An order by the judge determining that the petitioner does not have the right to condemn or refusing to assign the matter to the chairperson of the county condemnation commissioners may be appealed directly to the court of appeals.

 The Wallers' attorney stated on the record that there is no challenge to ATC's right to take the property described in the jurisdictional offer:
In this case ... this is a case in which we are not challenging their right to take. The only reason we're in that statute [Wis. Stat. § 32.06(5)] is because the statute says the only reason — the only way you can enforce (3m) is under this provision. This is really not a challenge action.

 The Wisconsin Utilities Association further argues that the provision of utility services such as electricity, gas, and water are "a quintessential public good at stake in the exercise of eminent *303 domain." It advances that "[Residents throughout Wisconsin depend on" condemnor-utilities for their utility services, and observes that this court's decision "not only affects the [utilities], it also affects their customers' interests in reasonably priced utility services and sufficient electric, gas, and water distribution infrastructure to support economic development and growth throughout Wisconsin."

 Upon resolution of questions regarding the necessity of a taking, the statute directs the circuit court to refer the valuation question to the condemnation commission. Wis. Stat. § 32.06(7). The condemnation commission is authorized by statute to "ascertain the compensation to be made for the taking of property or rights in property sought to be condemned," but *307 is not otherwise empowered to determine the necessity of the proposed taking. Wis. Stat. § 32.08(5).

 Wisconsin Stat. § 32.19(2)(e) provides as follows:
(e)l. "Displaced person" means, except as provided under subd. 2., any person who moves from real property or who moves his or her personal property from real property:
a. As a direct result of a written notice of intent to acquire or the acquisition of the real property, in whole or in part or subsequent to the issuance of a jurisdictional offer under this subchapter, for public purposes; or
b. As a result of rehabilitation, demolition or other displacing activity, as determined by the department of administration, if the person is a tenant-occupant of a dwelling, business or farm operation and the displacement is permanent.
2. "Displaced person" does not include:
a. Any person determined to be unlawfully occupying the property or to have occupied the property solely for the purpose of obtaining assistance under ss. 32.19 to 32.27; or
b. Any person, other than a person who is an occupant of the property at the time it is acquired, who occupies the property on a rental basis for a short term or a period subject to termination when the property is needed for the program or project for which it is being acquired.